## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MACDERMID PRINTING SOLUTIONS, INC.,
     Plaintiff,

     v.

CORTRON CORP.,
     Defendant.

No. 3:08cv1649 (MPS)

## ORDER RE: MOTION IN LIMINE TO PRECLUDE EXPERT JAMES A. LEVINSOHN

Defendant Cortron Corp. ("Cortron") seeks to preclude the testimony of James A. Levinsohn, an economist whom Plaintiff MacDermid Printing Solutions, Inc. ("MacDermid") has designated as an expert witness on antitrust and damages issues.  (Dkt. # 299.)  Dr. Levinsohn's report discloses that he will opine at trial that an alleged conspiracy entered into between Cortron and MacDermid's rival, E. I. du Pont de Nemours and Company ("DuPont"), in violation of Section 1 of the Sherman Act, harmed competition in markets in which MacDermid and DuPont compete, and also caused millions of dollars' worth of damage to MacDermid under various antitrust, trade secret, and breach of contract theories.  Because Dr. Levinsohn's opinions meet the requirements for the admission of expert opinion testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the motion to preclude is DENIED.

### A.  Background

On November 10, 2004, MacDermid and Cortron entered into an agreement wherein Cortron agreed to manufacture thermal flexographic processing machines that were designed by MacDermid.  (*See* Joint Development Agreement, dkt. # 241-2.)  Thermal flexographic processing is a technology used to develop plates for use in the labeling of commercial packaging, such as potato chip bags.  When MacDermid entered the thermal flexographic

business, the only other supplier of this technology was DuPont, which had developed its own thermal processing system several years earlier.  (*See* Levinsohn Report ("Report"), ¶¶ 17-22.)

On April 1, 2008, DuPont filed a lawsuit against Cortron in the United States District Court for the District of Minnesota, alleging that Cortron's work with MacDermid infringed one of its patents.  (*See* Am. Compl., dkt. # 88, ¶ 42.)  After attending a meeting with DuPont on April 1, 2008, Cortron and DuPont settled the lawsuit in an agreement that was signed in early June 2008, effective May 30, 2008.  (*See id.*, ¶ 40; Settlement Agreement.)  In the settlement agreement, Cortron agreed, among other things, to cease manufacturing technology "related to the thermal development of photopolymer plates without the express written consent of DuPont." (Settlement Agreement, ¶ 3.3.)  In exchange, DuPont agreed, among other things, to indemnify Cortron against any lawsuit brought by MacDermid.  (*Id.*, ¶ 4.2.)

Subsequent to this settlement agreement, Cortron allegedly gave DuPont the technical information relating to MacDermid's thermal processing technology, and then deleted this engineering data from its computer systems.  (*See* Am. Compl., dkt. # 88, ¶ 54, Seventh Count ¶ 80.)  On July 30, 2008, DuPont issued a press release announcing its settlement with Cortron:

> Under the terms of the agreement, Cortron, based in Minnesota, agrees to immediately cease manufacturing LAVA thermal flexographic printing plate processors, as well as to immediately discontinue providing all service, spare parts, and technical support for any LAVA equipment used to thermally develop flexographic printing plates.  Thermal processing equipment manufactured by Cortron has been marketed and sold by MacDermid Printing Solutions, LLC under the LAVA trade name.

(Press release, dkt. # 242-6.)  At some point in 2008 or early 2009 after this press release was issued, Cortron ceased all operations and closed its business.  (*See* L.R. 56(a)(2), dkt. # 257-1, Undisputed Issues of Material Fact ¶ 1.)

In 2008, MacDermid filed this lawsuit against Cortron alleging violations of the antitrust laws, breach of contract, misappropriation of trade secrets, spoliation, and violations of Connecticut statutes prohibiting computer crimes and unfair trade practices.  (*See* Am. Compl., dkt. # 88.)[1]   Cortron has denied these allegations and has, in turn, counterclaimed against MacDermid for alleged fraud and misrepresentation, breach of contract, unjust enrichment, misappropriation of trade secrets, and violations of Connecticut statutes prohibiting computer crimes and unfair trade practices.  (*See* Ans., dkt. # 230.)

**B.  Standards for Admissibility of Expert Testimony**

Rule 702 of the Federal Rules of Evidence sets forth the requirements for admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

This language was adopted in response to, and is consistent with the principles articulated in, the Supreme Court's decisions in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), which held that the principles of *Daubert* applied to non-scientific expert testimony.  *Daubert*, 509 U.S. at 592-93 (trial judge's inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."); *see also* Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amendment ("The [rule] specifically provides that the

---

[1] Related litigation between MacDermid and DuPont regarding the settlement agreement and ensuing press release, as well as issues related to patent infringement, is pending in the United States District Court for the District of New Jersey.  (*See* 06-cv-03383; 07-cv-04325; 10-cv-03409.)

trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.").

While Rule 702 and cases in the *Daubert/Kumho* line cast the trial judge in the role of gatekeeper, they also warn against keeping a heavy hand on the gate. The Second Circuit has made clear that "*Daubert* contemplates liberal admissibility standards," *Town of Southampton v. Suffolk County*, 367 Fed. App'x 234 (2010) (internal quotation marks omitted), and "reinforces the idea that there should be a presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). "[O]ur adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2002). The Second Circuit has frequently quoted the Supreme Court's own admonition against heavy-handed gate-keeping in *Daubert* itself, i.e., "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Other Circuits have likewise instructed trial judges to let the gate swing open in most cases. *See, e.g., United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("[T]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. . . . A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. . . . The same standard of reliability extends to the step in the expert's analysis that 'fits' his or her conclusions to the case at hand. Once again, we emphasize that the standard is not that high."). It is no surprise, then, that "[a] review of the

4

caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Advisory Committee Notes, 2000 Amendments to Fed. R. Evid. 702.

### C. Cortron's Challenges to Dr. Levinsohn's Opinions

Cortron does not challenge Dr. Levinsohn's qualifications. Rather, Cortron argues that he did not reliably determine the relevant geographic and product markets.

#### 1. Relevant Geographic Market

"The relevant geographic market is that area where purchasers may practically turn for the goods comprising the relevant product market or that area where producers of the relevant product effectively compete." *Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 418 (N.D.N.Y. 2004). Cortron argues that Dr. Levinsohn failed to analyze whether the relevant geographic market was broader than just the United States and, instead, simply assumed that the United States was the relevant geographic market. While the Court agrees that Dr. Levinsohn did not conduct a rigorous analysis to determine the relevant geographic market, it finds that, given the available facts, it was reasonable for Dr. Levinsohn to assume that the United States was the relevant geographic market, and that there is no suggestion that defining the geographic market more broadly would affect the analysis of whether Cortron's alleged conduct had an anti-competitive effect.

DuPont and MacDermid were, at the relevant times, the only suppliers of thermal flexographic processors in the world. (*See* Zoelle Decl., dkt. # 318-3, ¶ 32); Report, ¶ 66.) Both DuPont and MacDermid are U.S.-based companies, with facilities for manufacturing thermal flexographic processors located only in the United States at the relevant times. Further, although Cortron points to evidence in MacDermid's documents that MacDermid personnel referred to the market for flexographic processors as a "global market" and that the machines were sold in Asia

and Europe as well as the United States, counsel acknowledged at oral argument that thermal flexographic processors are large machines for which there would be significant shipping costs. *See Purex Corp. v. Procter & Gamble Co.*, 596 F.2d 881, 884 (9th Cir. 1979) ("Liquid bleach cannot be shipped economically more than three hundred miles from its place of manufacture because of high shipping costs and low sales prices.  Thus, the relevant geographic market for liquid bleach includes a series of regional markets, as well as the national market."); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) ("The geographic market selected must . . . correspond to the commercial realities of the industry . . . .").  Finally, there is no evidence – or even a suggestion by Cortron – that the market share allocation between DuPont and MacDermid (assuming the product market is properly defined as thermal flexographic processors) would change significantly if the market was viewed as a worldwide market rather than a U.S. market.  These facts suggest that the failure to define rigorously the geographic market would not have made a difference in determining the anticompetitive effects in this case, which is the ultimate goal of a "rule of reason" antitrust analysis.

In addition, the Second Circuit has held that "[i]n this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim.  If a plaintiff can show an actual adverse effect on competition, such as reduced output[,] we do not require a further showing of market power."  *Todd v. Exxon Corp.*, 275 F.3d 191, 207 (2d Cir. 2001); *see also Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("[T]hese cases [*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986), and *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000)] stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendant's market power – in lieu of

the usual showing of a precisely defined relevant market and a monopoly market share.").  In pleadings filed by DuPont in the United States District Court for the District of New Jersey, DuPont stated that MacDermid's entry into the thermal flexographic market caused it to reduce its prices and lose market share.  (*See* 06-cv-3383, dkt. # 31-1 at 16.)  DuPont's reported price decrease and loss of market share suggest that, if the allegations that DuPont conspired with Cortron in an attempt to eliminate MacDermid from the market are true, such a conspiracy could have actual anticompetitive effects.

Since it was reasonable for Dr. Levinsohn to assume that the United States is the relevant geographic market, and since there is no indication that a broader geographic market definition would have affected the analysis of anticompetitive effect, his failure to analyze rigorously the contours of the geographic market is not a basis for excluding his testimony.

### 2.  Relevant Product Market

"The relevant product market is comprised of products which are generally interchangeable or for which there is cross-elasticity of demand."  *Rome Ambulatory Surgical Ctr.*, 349 F. Supp. 2d at 418.  Cortron takes issue with Dr. Levinsohn's definition of one of the relevant product markets, i.e., thermal flexographic processors.[2]  First, Cortron points to testimony from MacDermid fact witnesses indicating that solvent flexographic technology is a "commercially viable substitute" for thermal flexographic technology, and argues that solvent technology should therefore be considered as part of the relevant market.  (*See* dkt. # 301 at 11 (quoting testimony from Dr. Timothy Gotsick and Mr. James Hennessy).)  Second, Cortron argues that there was insufficient data available to support application of the Significant and Non-transitory Increase in Price ("SSNIP") test.  The SSNIP test is described in the Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* as a methodology for

---

[2] He also defined a second relevant product market as digital, thermal plates.

determining the scope of a relevant product market, and is commonly used to define relevant markets for antitrust purposes. *See Meredith Corp. v. SESAC LLC*, No. 09-cv-9177, 2014 WL 812795, at *32 (S.D.N.Y. Mar. 3, 2014) ("[M]oreover, plaintiffs' market definition is confirmed by applying the "SSNIP" test . . . .").

With respect to the first argument, the fact that a MacDermid witness may have stated that solvent technology is a "commercially viable substitute" for thermal flexographic processing technology is relevant but not dispositive.  The question for purposes of defining an antitrust market is not simply whether some customers regard an alternative as a "commercially viable substitute," but whether a substantial number of customers have that perception such that they will switch their purchasing to the alternative product in response to a small but significant price increase in the main product, and thereby constrain the pricing decisions of the supplier of the main product.  By itself, the fact that one or two witnesses view another product as a "commercially viable substitute" is an insufficient basis to conclude that Dr. Levinsohn's narrower market definition is flawed.  With respect to the second argument, even accepting Cortron's point that there were insufficient data to support application of the SSNIP test, a robust SSNIP test is not a *sine qua non* of market definition and, as seen above, evidence of actual anticompetitive effects may supplant the need for a rigorous market definition.

Evidence of anticompetitive effects may also, in some instances, provide evidence of market definition, although that admittedly reverses the usual sequence of antitrust analysis.  For instance, evidence that two firms compete in the same narrowly defined product market may be found when a firm that is initially the sole supplier of a particular product must significantly decrease its prices and/or loses significant market share upon the entry of a second firm that makes the same product. *See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d

514, 522-23 (E.D.N.Y. 2005) (brand name drug manufacturer's estimation of significant loss of market share and expectation to "drastically reduce[] prices" upon entry of generic drug manufacturer supported product market definition for ciprofloxacin, rather than an expanded definition that would include other drugs in the same molecular family as ciprofloxacin).  As noted by Dr. Levinsohn and as discussed above, there is some evidence of such a price decrease and loss in market share in statements made by DuPont in pleadings filed in federal court in New Jersey: "DuPont is now beginning to experience a significant slow-down in revenue growth, a reduction in selling prices and damage to its reputation and goodwill in the printing industry as a result of MacDermid's infringement of the '859 patent."[3]  (Report, ¶¶ 57, 63; 6-cv-3383, dkt. # 31-1 at 16; *see also* Zoelle Decl., dkt. # 318-3, ¶ 23 ("[T]he rate of growth as discussed above has slowed since MacDermid began offering thermally-developed plates.").)  These allegedly significant price and market share effects are at least some evidence supporting Dr. Levinsohn's narrow market definition.

Another piece of evidence that may speak to market definition – again, indirectly – is profit margin.  For some of DuPont's thermal flexographic processor customers, the margin was allegedly more than 50%.  Such a high profit margin is suggestive of market power, and here at least, the notion that DuPont has market power supports Dr. Levinsohn's view that the market should be defined narrowly.  (Report, ¶ 65); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d at 523 ("[T]he pricing strategy . . . compels an inference that Bayer was reaping an abnormally high price-cost margin, given the 95 percent price drop that was to occur almost a

---

[3] The '859 patent, which is the subject of a pending lawsuit in federal court in New Jersey that DuPont filed against MacDermid in 2006, is DuPont's patent for the "process for making a flexographic printing plate and a photosensitive element for use in the process."  The alleged conspiracy between Cortron and DuPont took place after DuPont filed a lawsuit against Cortron in federal court in Minnesota in 2008 for infringement of its '454 patent, a patent for the "method and apparatus for thermal processing a photosensitive element."  The technology protected by the '859 patent is used in conjunction with the technology protected by the '454 patent.

full year in the future for an identical quantity of an identical strength of the identical drug. Given Bayer's obvious ability to control prices, and its admission that it did not anticipate a commensurate drop in its own production costs for Cipro, it is reasonable to accept plaintiffs' contention and conclude both that the relevant market is for ciprofloxacin and that Bayer had market power within that market.").

In addition, although Dr. Levinsohn does not rely on this fact in his report, there is further support for his analysis and, in particular, his "effects" approach to market definition in the fact that, by 2005, the U.S. sales of thermal flexographic printing plates were "faster than the growth in the [U.S.] of solvent-type plates during this same period."  (Zoelle Decl., dkt. # 318-3 ¶ 22.) Cortron's expert, Dr. Harris, agreed that the fact that the thermal market was growing faster than the solvent market is evidence that thermal flexographic technology is a discrete market:

> Q. And if the growth rate of FAST was greater than the growth rate of solvent technology, what would that tell you as an economist?
>
> A. It would tell me that thermal was a very competitive technology; that whereas -- because it was a newer technology, whereas there was a very, very large installed base of solvent processors, where people could continue and did continue to use them, if all one has to do is look at the sales of solvent plates to know that solvent continued to be successful, if you have a new technology which is literally new, and you have an older technology which has a very large embedded base, you are going to expect to see a fairly large share of the new processors sold via the newer technology.
>
> Q. Would that be a factor to consider; namely, the relative growth rates of one versus the other when defining a relevant market?
>
> A. Yes.
>
> . . .
>
> Q. So if the growth rate of FAST was substantially greater than the growth rate of solvent, that would be one factor to consider in defining the relevant market; is that right?
>
> A. Yes.

(Harris Dep. at 134-35.)

While Cortron's grievances about Dr. Levinsohn's product market definition are appropriate issues to explore during cross-examination, he has applied accepted principles of market definition in a manner that is sufficiently reliable to pass through the *Daubert* gate.

### 3.   Other Arguments

Cortron makes a number of other arguments in support of its Motion in Limine.  First, it argues that Dr. Levinsohn's analysis is unreliable because it is inconsistent to opine that MacDermid lost sales when his analysis shows that MacDermid gained sales of the 2530 LAVA machines.  This argument goes to weight rather than admissibility, as it amounts to an attack on the correctness of Dr. Levinsohn's conclusions.  As seen in Exhibit 1c of Dr. Levinsohn's Report, sales of the 2530 LAVA machine flat-lined for over a year after the announcement of the DuPont/Cortron settlement agreement, and did not increase significantly until the spring of 2010.  Further, Dr. Levinsohn's report shows that the monthly demand for the 4260 LAVA processors *did* drop for the two years following DuPont's announcement of its settlement agreement with Cortron.  (Report, Ex. 1b.)  Dr. Levinsohn also opines that the actual sales data do not account for the additional number of machines that MacDermid anticipates that it would have placed had it not been for the DuPont/Cortron settlement agreement.  (*Id.*, ¶ 77; *see also id.*, ¶ 45 (summarizing testimony and communications of MacDermid witness that consumers were hesitant to purchase MacDermid's LAVA products after the DuPont/Cortron settlement agreement was announced).)

Next, Cortron argues that Dr. Levinsohn failed to account for the negative impact of the recession and the design defects of MacDermid's products in his regression analysis.  At his deposition, Dr. Levinsohn testified that he had considered the issue of macroeconomic effects.  (Levinsohn Dep., dkt. # 258-8 at 28, 37-38.)  Dr. Levinsohn also explained why he thought that

his analysis was appropriate, even if there were design defects in the product lines. (Levinsohn Dep., dkt. # 322-1 at 215-16.) Again, whether his responses to Cortron's arguments about the conclusions he reached are persuasive will be for the jury to decide.

Finally, Cortron attacks Dr. Levinsohn's conclusion that Cortron's conduct resulted in an antitrust injury, i.e., harm to competition. First, the price effects that MacDermid's entry reportedly had upon DuPont's thermal flexographic products suggest that there might also have been price effects on consumers from DuPont's alleged attempts to exclude MacDermid. Second, Dr. Levinsohn presents the theory that DuPont's announcement of the DuPont/Cortron settlement agreement sowed seeds of doubt in the mind of consumers who were interested in purchasing thermal flexographic technology from MacDermid. (*See* Report, ¶ 45 (citing an August 19, 2008 email from MacDermid's Director of Global Project Management that stated that "[t]he last DuPont press release [Cortron-DuPont settlement announcement] is having a greater effect on [MacDermid] customers than we would like.").) This suggests that, to the extent that consumers were dissuaded from entering into business with MacDermid, consumers were injured by having fewer product choices with DuPont, since DuPont only leased thermal flexographic machines, and required customers to use only DuPont's thermal plates, i.e., it allegedly engaged in bundling or tying, while MacDermid offered more options by allowing customers to buy or lease the machines and to purchase the plates separately if they chose to do so. (*See id.*, ¶¶ 18, 18 n.13, 19, 24.) Once again, any issue that Cortron has with Dr. Levinsohn's analysis of the impact on competition is appropriate to take up on cross-examination.

For the foregoing reasons, the motion to preclude the expert testimony of James A. Levinsohn is DENIED.

IT IS SO ORDERED.


     /s/ Michael P. Shea

Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
               June 12, 2014