UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MACDERMID PRINTING SOLUTIONS, INC., <br>         Plaintiff, <br><br> v. <br><br> CORTRON CORP., <br>         Defendant. | No. 3:08cv1649 (MPS) |

### ORDER RE: MOTION IN LIMINE TO PRECLUDE EXPERT JOHN H. KRAMER

In this commercial dispute, Defendant and Counter-claimant Cortron Corp. ("Cortron") contends that Plaintiff and Counterclaim Defendant MacDermid Printing Solutions, Inc. ("MacDermid") destroyed its business, and proposes to introduce expert testimony on damages from John H. Kramer that is based on a valuation of the business as of the time the conduct that allegedly led to its destruction began.  MacDermid has moved in limine to preclude the valuation opinion, arguing that it does not satisfy the requirements of Fed. R. Evid. 702 and the principles of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).   I must decide whether Mr. Kramer has reliably applied the "destruction of business" valuation method to this case, in which the allegedly offending conduct began some four years before Cortron's business was finally destroyed.  Because there will apparently be evidence that Cortron would have pursued a different path but for the allegedly offending conduct, that it immediately began suffering harm from the date the conduct began, and that it ultimately was destroyed, the lengthy gap between the onset of the conduct and Cortron's demise does not make use of the "destruction of business" valuation method so unreliable in this case as to warrant preclusion of Mr. Kramer's testimony.  Cortron will, of course, have to lay a foundation for the testimony, and MacDermid may probe the weaknesses in the expert's analysis, including his application of the "destruction of business"

valuation method to this case, on cross-examination, the usual tool for challenging an expert's opinions. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## I.    Factual Background

On November 10, 2004, MacDermid and Cortron entered into an agreement wherein Cortron agreed to manufacture thermal flexographic processing machines that were designed by MacDermid.  (*See* Joint Development Agreement, dkt. # 241-2.)   Thermal flexographic processing is a technology used to develop plates for use in the labeling of commercial packaging, such as potato chip bags.  When MacDermid entered the thermal flexographic business, the only other supplier of this technology was DuPont, which had developed its own thermal processing system several years earlier.  (*See* Levinsohn Report ("Report"), ¶¶ 17-22.)

On April 1, 2008, DuPont filed a lawsuit against Cortron in the United States District Court for the District of Minnesota, alleging that Cortron's work with MacDermid infringed one of Dupont's patents.  (*See* Am. Compl., dkt. # 88, ¶ 42.)  After attending a meeting with DuPont on April 1, 2008, Cortron and DuPont settled the lawsuit in an agreement that was signed in early June 2008, effective May 30, 2008.  (*See id.*, ¶ 40; Settlement Agreement.)   In the settlement agreement, Cortron agreed, among other things, to cease manufacturing technology "related to the thermal development of photopolymer plates without the express written consent of DuPont." (Settlement Agreement, ¶ 3.3.)  In exchange, DuPont agreed, among other things, to indemnify Cortron against any lawsuit brought by MacDermid.  (*Id.*, ¶ 4.2.)

Subsequent to this settlement agreement, Cortron allegedly gave DuPont the technical information relating to MacDermid's thermal processing technology, and then deleted these

engineering data from its computer systems. (*See* Am. Compl., dkt. # 88, ¶ 54, Seventh Count ¶ 80.) On July 30, 2008, DuPont issued a press release announcing its settlement with Cortron:

> Under the terms of the agreement, Cortron, based in Minnesota, agrees to immediately cease manufacturing LAVA thermal flexographic printing plate processors, as well as to immediately discontinue providing all service, spare parts, and technical support for any LAVA equipment used to thermally develop flexographic printing plates. Thermal processing equipment manufactured by Cortron has been marketed and sold by MacDermid Printing Solutions, LLC under the LAVA trade name.

(Press release, dkt. # 242-6.) At some point in 2008 or early 2009 after this press release was issued, Cortron ceased all operations and closed its business. (*See* L.R. 56(a)(2), dkt. # 257-1, Undisputed Issues of Material Fact ¶ 1.)

In 2008, MacDermid filed this lawsuit against Cortron alleging violations of the antitrust laws, breach of contract, misappropriation of trade secrets, spoliation, and violations of Connecticut statutes prohibiting computer crimes and unfair trade practices. (*See* Am. Compl., dkt. # 88.)[1]  Cortron has denied these allegations and has, in turn, counterclaimed against MacDermid for alleged fraud and misrepresentation, breach of contract, unjust enrichment, misappropriation of trade secrets, and violations of Connecticut statutes prohibiting computer crimes and unfair trade practices. (*See* Ans., dkt. # 230.)

## II.       Summary of Mr. Kramer's Proposed Testimony

Cortron plans to offer Mr. Kramer's opinion as to the fair market value of Cortron. Mr. Kramer performed this valuation using a "destruction of business" methodology, which, according to his report, is appropriate for businesses that have been destroyed and not merely injured. (Kramer Report ("Report") at 2.) The "destruction of business" method measures

---

[1] Related litigation between MacDermid and DuPont regarding the settlement agreement and ensuing press release, as well as issues related to patent infringement, is pending in the United States District Court for the District of New Jersey. (*See* 06-cv-03383; 07-cv-04325; 10-cv-03409.)

3

damages by calculating "the market value of the business on the date of destruction, less any salvage value in the assets," which is analogous to "the difference in the value of the business before and after its destruction."  Robert L. Dunn, RECOVERY OF DAMAGES FOR LOST PROFITS, § 6.23 (6th ed. 2005).  Mr. Kramer selected November 10, 2004, as the date of destruction because it was the date that Cortron and MacDermid entered into their Joint Development Agreement. (Report at 1.)

To calculate the fair market value of the business as of November 10, 2004, Mr. Kramer selected the income approach, which values a business by projecting the business's expected income stream and discounting that income to derive its present value.  (*See id*. at 11); Shannon Pratt & Alina V. Niculita, THE LAWYER'S BUSINESS VALUATION HANDBOOK: UNDERSTANDING FINANCIAL STATEMENTS, APPRAISAL REPORTS, AND EXPERT TESTIMONY 24-25 (7th ed. 2010). The projected income stream that Mr. Kramer relied upon was based on financial projections created by a Cortron employee in January 2005 in the ordinary course of business.  (Report at 11; Kramer Dep. at 142-43; January 2005 Cortron projections, dkt. # 300-4.)  Mr. Kramer did not make any adjustments to the projections before relying upon on them for his analysis.  (Kramer Dep. at 115.)  He concluded that Cortron's value as of November 10, 2004 was $6,280,000. (Report at 1, 13.)

Mr. Kramer's report makes clear that he will express no opinion as to causation and that his valuation opinion is based on financial projections provided by Cortron's management.

### III. Discussion

#### A. Standards for Admissibility of Expert Testimony

MacDermid does not challenge Mr. Kramer's qualifications and acknowledges that the "destruction of business" valuation method is a recognized method for valuing a business that

4

has been destroyed. (*See* MacDermid Reply Br., dkt. # 336 at 2.) Its attack focuses on the application of this method to the facts of this case. (*Id.*)

Rule 702 of the Federal Rules of Evidence sets forth the requirements for admission of expert testimony, including the requirement that the analytical method selected by the expert be "reliably applied . . . to the facts of the case":

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and *(d) the expert has reliably applied the principles and methods to the facts of the case*.

(emphasis added). This language was adopted in response to, and is consistent with the principles articulated in, the Supreme Court's decisions in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), which held that the principles of *Daubert* applied to non-scientific expert testimony. *Daubert*, 509 U.S. at 592-93 (trial judge's inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."); *see also* Fed. R. Evid. 702 Advisory Committee's Note, 2000 Amendment ("The [rule] specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.").

While Rule 702 and cases in the *Daubert*/*Kumho* line cast the trial judge in the role of gatekeeper, they also warn against keeping a heavy hand on the gate. The Second Circuit has made clear that "*Daubert* contemplates liberal admissibility standards," *Town of Southampton v. Suffolk County*, 367 Fed. App'x 234 (2010) (internal quotation marks omitted), and "reinforces

5

the idea that there should be a presumption of admissibility of evidence," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). "[O]ur adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2002). The Second Circuit has frequently quoted the Supreme Court's own admonition against heavy-handed gate-keeping in *Daubert* itself, i.e., "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Other Circuits have likewise instructed trial judges to let the gate swing open in most cases. *See, e.g., United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996) ("the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("[T]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. . . . A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. . . . The same standard of reliability extends to the step in the expert's analysis that 'fits' his or her conclusions to the case at hand. Once again, we emphasize that the standard is not that high."). It is no surprise, then, that "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Advisory Committee Notes, 2000 Amendments to Fed. R. Evid. 702.

### B. "Destruction of Business" Method of Valuation

The Second Circuit has expressly approved the "destruction of business" valuation method that Mr. Kramer used in this case. In *Indu Craft v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995), the Court stated:

> [P]roof of lost profits is but one method of proving the amount necessary to restore plaintiff to the economic position he would have been in absent the breach. An alternative methodology, extrapolating the value of a business as an ongoing entity from the company's past earnings, establishes a plaintiff's damages without suffering the same defect. By resorting to past earnings, this methodology already incorporates the necessary deduction of fixed and variable costs, providing an accurate measurement of plaintiff's loss as adjusted for savings resulting from the breach. In fact, when the breach of contract results in the complete destruction of a business enterprise and the business is susceptible to valuation methods, such an approach provides the best method of calculating damages. *Cf. Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) ("where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages"), *cert. denied*, 499 U.S. 907, 113 L. Ed. 2d 218, 111 S. Ct. 1109 (1991). The methodology of determining a business's earnings and applying an earnings multiplier to fix the value of a business that was completely terminated is one we have approved. *See Lamborn v. Dittmer*, 873 F.2d 522, 533-34 (2d Cir. 1989).

47 F.3d at 495-96.[2] Although the "destruction of business" valuation method is perhaps most naturally suited to a case involving the sudden death of an enterprise in which its value plummets to zero immediately after a single crushing loss, for example, after an industrial accident, *see, e.g., Sawyer v. Fitts*, 630 S.W.2d 872 (Tex. Ct. App. 1982) (market value of business immediately prior to its destruction through roof collapse was proper measure of damages), courts have also approved use of the method in breach-of-contract and other commercial cases involving a more gradual business decline.

In *Indu Craft*, for example, the plaintiff, a clothing importer that relied on letters of credit from the defendant bank to finance its supplies, went out of business nine months after the bank substantially delayed issuing new letters of credit following a refusal by the plaintiff's principal to assist the son of the bank's principal in a new business venture. The Second Circuit reinstated a jury award for the plaintiff, finding plaintiff's expert's "destruction of business" valuation method to be adequate to support the jury's verdict. Similarly, in *W.S.A., Inc. d/b/a Harmon*

---

[2] In this case, Mr. Kramer used projections, rather than "past earnings," to determine the value of Cortron, and MacDermid challenges the validity of those projections. This issue, which relates more to the quality of the data on which Mr. Kramer relied than on the methodology itself, is discussed in Section III.D. below.

7

*Contract v. ACA Corporation*, Nos. 94-cv-1493 and 94-cv-1868, 1998 U.S. Dist. LEXIS 14461, at *20-22 (S.D.N.Y. Sept. 15, 1998) (Haight, J.), the court denied summary judgment in a breach of contract and fraudulent inducement case arising from a construction subcontract, in which the counterclaim plaintiff sought damages for the destruction of its business allegedly flowing from the counterclaim defendant's misrepresentations at the time the subcontract was executed. The court found that the counterclaim plaintiff's expert valuation, "which valued the company at $960,000 as of September 30, 1993, before the ruinous Rikers Island contract with [the counterclaim defendant]," constituted "evidence sufficient to support a verdict for damages." *Id*. at *18, *23. In that case, the plaintiff claimed that the defendant's delays in supplying designs and materials – allegedly beginning shortly after execution of the subcontract and continuing for eight months or so before the lawsuit was filed – had left it unable to pay its labor force and ultimately driven it out of business. *Id*. at *2, *9; *see also W.S.A., Inc. v. ACA Corp.*, Nos. 94-cv-1493 and 94-cv-1868, 1996 U.S. Dist. LEXIS 14198, at *3-*6 (S.D.N.Y. 1996 Sept. 27, 1996).

Both *Indu Craft* and *Harmon* were applications of the more general principle that "where the breach [of contract] involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." *Sharma*, 916 F.2d at 825. That market value "is the discounted value of the stream of future income that the assets are expected to produce. This stream of income, of course, includes expected future profits and/or capital appreciation." *Id*. at 826.

### C. Application of the "Destruction of Business" Method to this Case

Although this case involves a much longer time frame between the alleged breach of duty – MacDermid's alleged misrepresentations about infringement and about the LAVA machines

when Cortron signed the contract in 2004 – and the alleged destruction of the business in 2008, there is no reason, in theory, that the destruction of a business after it is induced by misrepresentations to enter into a "ruinous contract," *Harmon*, 1998 U.S. Dist. LEXIS 14461, at *20-22, cannot be gradual or that this Court should impose some arbitrary time limit on use of this particular valuation method.  And in this case, as in *Indu Craft* and *Harmon*, there is some evidence that the misrepresentations or other breaches of duty attributed to MacDermid in 2004 led Cortron to suffer immediate, tangible harm that worsened as the contract evolved.

Specifically, in early 2005, MacDermid allegedly represented that a realistic forecast for the sale of LAVA Gen I machines was 35 to 40 machines annually, but MacDermid ultimately asked Cortron to produce only a total of 30 to 40 machines across the duration of their four-year relationship, even though Cortron sought to produce more.  (*See* Fry Dep. at 163, 197-99; Copeland Dep. at 93.)  Further, allegedly as a result of representations by MacDermid at the time the Joint Development Agreement was signed, *see* Nov. 18, 2004 LAVA Business Plan Outline ("Design of our [LAVA 360/Cortron hybrid system] device is not complete, but will be completed as part of the Joint Development Agreement recently signed with Cortron."), Cortron expected to develop LAVA Gen II machines in conjunction with MacDermid and, based on this expectation, devoted significant resources to its relationship with MacDermid to the exclusion of other potential business relationships.  (*See* Kramer Dep. at 114 ("It is my understanding that the interaction with MacDermid caused Cortron to have to shelve its eXact product line.  And they did very little in sales in eXact as a result.  And it is my understanding that it is Cortron's claim that MacDermid demanded so much of their time that it interfered with the Esko relationship at the same time.").)  The LAVA Gen II machine never came to fruition, however, and MacDermid terminated its development program.  (*See* Fry Dep. at 182-83; Merkel Dep. at 30-31.)  There is

also evidence that arguably supports Cortron's allegation that MacDermid breached the Joint Development Agreement by "fail[ing] to adequately support Cortron's efforts under the [Joint Development Agreement]." (*See* Am. Counterclaims., dkt. # 230, ¶ 55; Jan. 29, 2007 email from Dan Fry to Scott Benson ("Napp did not do the greatest job of finishing all of the designs and drawings so, Cortron is taking the brunt of the issues that we, MacDermid, knowing [sic] created.").)

In light of all this, Mr. Kramer's application of the "destruction of business" methodology to this case – and his selection of the date the contract was entered into as the measurement date – find enough support in the facts to pass through the *Daubert* gate, and Cortron's objections go to the weight of the evidence rather than its admissibility. *Chief Info. Officer v. Computers Plus Ctr., Inc.*, 310 Conn. 60, 108 (2013) (where counterclaim plaintiff claimed that business was destroyed by counterclaim defendant, "[w]hether the date that [counterclaim plaintiff's expert] determined, in her expert opinion, was the appropriate date as of which to perform her valuation, however, does not implicate the admissibility of her testimony, but rather its weight.").

To be sure, the lengthy delay between the alleged breach of duty in 2004 and the alleged destruction of the business in 2008 raises a question about *causation* – and specifically, whether the alleged misrepresentations in 2004 could have proximately caused Cortron's demise in 2008 – but Mr. Kramer has not been disclosed as an expert on causation and his report makes clear that he intends to express no opinion on that subject. More specifically, he was asked to assume that MacDermid made the misrepresentations in question and that those misrepresentations caused Cortron's demise. (Kramer Dep. at 20, 22-23, 193.) Given those assumptions – for which Cortron will have to supply supporting evidence at trial – I cannot conclude that Mr.

Kramer's application of the "destruction of business" valuation method to the facts of this case is so unreliable as to warrant preclusion of his testimony.[3]

### D. Objection to Mr. Kramer's Reliance on Cortron's Internal Projections

MacDermid also argues that Mr. Kramer's opinions should be precluded because he relied on projections prepared by Cortron's management that belied the company's past performance and because he did not take adequate steps to verify the accuracy or reasonableness of the projections. In his deposition, however, Mr. Kramer testified that he understood the projections – which were prepared in the ordinary course of business in January 2005 and well before any litigation between the two companies – to reflect the company's strong expectations for a new "eXact model" technology developed but not yet fully commercialized by the company. (Dep. at 80. 158-59 (describing Mr. Kramer's discussions with Cortron's management regarding basis for expected quantities of sales)). He also testified that he had accounted for the uncertainty of using projections to value the business's future income stream by using a "pretty high discount rate." (*Id*. at 168.)

With regard to his assessment of the discrepancy between the company's past performance and the projections he used, Mr. Kramer testified that in most of the decade immediately preceding the projection period, in which the company had not turned a profit, the company was focusing its efforts on research and development, with the expectation that the

---

[3] MacDermid also argues that Mr. Kramer improperly assumed that Cortron's business would continue "in perpetuity." But that argument just restates the objection to the use of a "destruction of business" valuation method, as opposed to a lost profits method, for calculating damages in this case. Any valuation of a business using an income method – i.e., a valuation of the business as a stream of future income discounted to present value – "assumes" that the business will continue "in perpetuity." As a practical matter, moreover, the use of a discount rate to reflect the present value of the income means that "in perpetuity" translates to a limited time frame, after which the present value of the future income reaches zero. In this case, Mr. Kramer testified that, given the "pretty high" discount rate he used, the zero point would be reached after about twenty years. (Kramer Dep. at 71, 168.) The added income from the latter part of that twenty-year period would be small, and would trend towards zero. It is also worth noting that Cortron had been in business for over twenty years before it entered into the November 2004 agreement with MacDermid. In any event, it will be for the jury to decide whether Mr. Kramer's assumption that Cortron would have remained in business for twenty years absent the agreement with MacDermid is reasonable in light of the evidence.

11

research and development would "pay off in future periods." (*Id*. at 92; *see also id*. at 142 ("[T]he company during this period of time was investing pretty substantially in research and development costs. A lot of that negative cash flow was being generated by research and development for future product.").) He noted that the company had followed such a pattern in the past, initially developing new technology (the "step and repeat machine") and selling it profitably for a period in the early to mid-1990s, only to see that technology become obsolete, necessitating a new period of research and development leading to development of the eXact technology. (*Id*. at 91-92.)

Mr. Kramer described Cortron's history as a series of cycles, and noted that the "down cycle" immediately preceding the projection period reflected the company's focus on research and development, and that its projections reflected that it was "poised to take advantage of all of the research and development efforts that they had undertaken." (*Id*. at 106, 108; *see also id*. at 142 ("It was the expectation that these new technologies would carry the company forward.").) Contrary to MacDermid's contentions, Mr. Kramer testified that did not simply "accept" the projections provided by Cortron management but checked them by speaking to Cortron's management "about the patents that they had, and about the work that they were doing, and about their expectations prior to using the numbers that were presented in their projection." (*Id*. at 115.) He also testified that he had compared the projections with Cortron's past historical performance and while the projections were not consistent with the performance of "the last few years," "[i]f you go back a ways [a period Mr. Kramer acknowledged was "a decade"], the company was performing at these levels" (*id*. at 116) – a position that is consistent with his overall assessment that the company's business history progressed in cycles.

MacDermid points out that there are few, if any, business records that support Mr. Kramer's analysis, the representations of Cortron management, or the underlying projections on which he relied. Mr. Kramer testified, however, that Cortron – which ceased doing business in 2008 – had few such records available by the time he was retained. (*Id*. at 203.) Thus, it appears there was little Mr. Kramer could do to verify the projections or test their reliability, other than by talking to former Cortron employees, which he did. The paucity of documents to support the projections, the discrepancies between the projections and the company's historical performance, and any other aspects of Mr. Kramer's analysis will, of course, be fodder for cross-examination, but under the circumstances, they do not warrant a finding that his analysis is so unreliable to warrant preclusion of his testimony.

                IT IS SO ORDERED.


                  /s/ Michael P. Shea
                Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              June 12, 2014