**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MACDERMID PRINTING SOLUTIONS, INC., Plaintiff, <br><br> v. <br><br> CORTRON CORP., Defendant. | No. 3:08cv1649 (MPS) |

## RULING ON MOTION FOR JUDGMENT AS MATTER OF LAW

After hearing evidence for three weeks in this business dispute, a jury rendered a verdict for the Plaintiff, MacDermid Printing Solutions, Inc. ("MacDermid"), awarding millions of dollars of damages on its antitrust, breach of contract, trade secrets, and other claims, and finding against the Defendant, Cortron Corporation ("Cortron"), on all of its counterclaims. The jury did not address one issue raised by Cortron's counterclaims for fraud and negligent misrepresentation, however, because I resolved that issue against Cortron before the case was submitted to the jury. *See* Fed. R. Civ. P. 50(a). That issue is whether MacDermid fraudulently and negligently represented that its technology did not infringe a patent held by a third party. This memorandum explains why I chose to grant judgment as a matter of law on that issue to MacDermid, in response to its motion for judgment as a matter of law [#397]. It replaces, rather than supplements, my brief remarks on the record on this point.

## INTRODUCTION

In November 2004, MacDermid and Cortron entered into a Joint Development Agreement to collaborate in the development of a new thermal flexographic processor, a machine that develops plates used to print labels on commercial packages, such as potato chip bags and toothpaste tubes. In April 2005, the two entered into a Manufacturing Agreement under which Cortron agreed to manufacture for MacDermid an already existing model of thermal

flexographic processor that MacDermid had previously designed.   In both agreements, MacDermid represented to Cortron that MacDermid's technology did not infringe the intellectual property rights of third parties.

In 2008, DuPont de Nemours Corporation ("DuPont"), which had also developed a thermal flexographic processor and which regarded MacDermid as a competitor, sued Cortron, alleging that Cortron's work with MacDermid infringed one of the patents on DuPont's processor known as the '454 Patent.[1]   Cortron quickly settled with DuPont, agreeing to stop working with MacDermid.   Shortly thereafter, MacDermid brought this action against Cortron, claiming that the Cortron-DuPont settlement was a conspiracy in violation of the antitrust laws, entailed the transfer of MacDermid's trade secrets from Cortron to DuPont, and breached Cortron's obligations under the Joint Development and Manufacturing Agreements.   Cortron counterclaimed, alleging, among other things, that MacDermid had (i) fraudulently misrepresented that its technology did not infringe the intellectual property rights of third parties, and (ii) negligently made the same misrepresentation.   An essential element of both of these counterclaims is that MacDermid's statement that it did not infringe the intellectual property rights of third parties was a statement of fact, rather than a statement of opinion.   Because, in my view, no reasonable juror could find from the evidence at trial that the representation of non-infringement was conveyed and understood as a statement of fact, I declined to submit these claims to the jury and granted judgment as a matter of law as to these claims.[2]

---

[1] DuPont, which is not a party to this lawsuit, had also sued MacDermid in 2006 in the United States District Court for the District of New Jersey for infringing two other patents relating to DuPont's thermal flexographic processor. Later, in 2010, DuPont would sue MacDermid on the '454 Patent as well.  Those cases remain pending in federal court in New Jersey as of this writing, and no final determination as to infringement has been made.

[2] Cortron's counterclaims also alleged that MacDermid had breached the representation of non-infringement in the Joint Development and Manufacturing Agreements, and the related promise to indemnify Cortron from damages arising from such breach, by refusing to defend Cortron in DuPont's lawsuit.  I allowed the jury to decide this claim, because, as a breach of contract claim, it did not require proof of a statement of fact.  The jury decided this claim against Cortron, finding that MacDermid did not breach the Joint Development and Manufacturing Agreements in

## STANDARD FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A)

The court "will grant a motion for judgment as a matter of law only if, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror would be compelled to find in favor of the moving party." *Drew v. Connolly*, 536 Fed. App'x 164, 165 (2d Cir. 2013) (internal quotation marks and citation omitted). The Second Circuit has held that:

> [w]hen evaluating a motion under Rule 50, courts are required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in its favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe.

*ING Global v. UPS Oasis Supply Corp.*, No 13-489-cv, 2014 WL 2922656, at *4 (2d Cir. June 30, 2014) (internal quotation marks and citations omitted). In making its evaluation, the court should "review all of the evidence in the record." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001).

## RELEVANT FACTUAL BACKGROUND

Viewed through the lens imposed by Rule 50(a), the relevant evidence at trial was as follows. MacDermid began developing a thermal flexographic processor, which it dubbed "Lava," between 2001 and 2004. At the time, the only supplier of thermal flexographic printing technology was DuPont, which had developed its own thermal flexographic processor several years earlier. MacDermid was aware of DuPont's machine and the fact that DuPont had

---

any respect. I also allowed the jury to decide Cortron's other fraud and negligent misprestenation allegation, i.e., that MacDermid misrepresented that it would provide Cortron with significant manufacturing business. The jury decided that claim against Cortron too.

succeeded in patenting some and was seeking to patent other technology related to its machine. For example, a November 2001 internal MacDermid email by a MacDermid "senior scientist" states: "G. Markhart informed us at our last Lava project meeting that our patent attorney said we can't simply copy DuPont's thermal equipment patent… No surprise there.  He mentioned that new ideas need to be submitted to our patent attorney to circumvent the DuPont patent."  (Tr. Ex. 9).  Other documents from the same period confirm that MacDermid was consulting its in-house attorney, John Cordani, about ways to "get around the patent."  (Tr. Exs. 10-13.)  Mr. Cordani corroborated this in his trial testimony.  He testified that his practice was to work closely with research and development personnel to advise of obstacles presented by existing patents and to help find ways to "design around" such patents, and that he played this role in the development of the Lava machine.  *See Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1457-58 (Fed. Cir. 1984) ("In short, defendants have successfully designed around Roeder's claims, as they had a right to do."); *Bristol-Myers Squibb Co. v. Andrx Pharms., Inc.,* 343 F. Supp. 2d 1124, 1135 (S.D. Fla. 2004) ("[I]t is entirely lawful to deliberately design around a patent.").  MacDermid also apparently considered attempting to invalidate the patent.  (Tr. Ex. 1551, internal MacDermid email dated February 18, 2002: "Patent investigation continues but even with good chances to attack the patent, we still need to come up with a change to one or more of the claims.")

A specific area of concern with respect to one of the DuPont patents related to the temperature of the "substrate", which was one of the layers used to develop a finished printing plate in a thermal, flexographic processor.  The patent at issue, "Method and Apparatus for Thermal Processing A Photosensitive Element," U.S. 6,797,454 (the "'454 Patent"), issued on September 28, 2004, and was admitted into evidence.  (Tr. Ex. 8.)   At trial, the parties focused in

part on the following language of claim 17 of the '454 Patent: "maintaining the temperature of the exterior surface of the flexible substrate to a temperature at least 20 [degrees] F. below the exterior surface temperature of the heated composition layer while in contact with said absorbent layer to control thermal distortion of the substrate."   Thermal distortion of the substrate referred to the fact that allowing the substrate to become too hot would distort its size and shape.  (See Tr. Ex. 585, Frank Hull Tr. Test. at 101-02.)

While the parties contested whether the concern over temperature and the above-quoted language of claim 17 ultimately affected the question of patent infringement, the evidence viewed in the light most favorable to Cortron shows at least that MacDermid believed, when developing its own machine, that temperature raised a potential "patent issue."  For example, in an October 2003 email discussing testing of the Lava machine, one MacDermid employee wrote: "Also – were the temperatures in the last run still around 125-130 plateau that you had discussed the other day?  Any idea where these would go if the chiller was turned off?  I'm thinking patent issues with that last remark . . . ."  (Tr. Ex. 818.)  By this time, DuPont had submitted an application to the Patent and Trademark Office for what would become known as the '454 Patent, which included the above-quoted claim language regarding maintaining a temperature differential between the "flexible substrate" and the "heated composition layer."

MacDermid ultimately built a prototype of the Lava machine and displayed it at a trade show in Germany in the Spring or Summer of 2004.  Cortron representatives approached MacDermid representatives at the show, expressing interest in the possibility of collaborating with MacDermid on a new generation of thermal processor that would incorporate light technology that Cortron had been developing.  The parties also discussed Cortron's building Lava processors using MacDermid's existing model.

As these discussions progressed, Frank Hull, Cortron's head engineer, traveled to MacDermid's facility in California to take a closer look at the prototype machine.  Together with Gary Markhart, a MacDermid engineer, he inspected the insides of the machine.  During the visit, Mr. Hull, who also testified at trial, noticed a "box" off to the side of the machine.  Mr. Hull asked Mr. Markhart the purpose of the box.  Mr. Markhart responded, "That's to keep the machine green."  Mr. Markhart did not show Mr. Hull the box.  Mr. Hull testified that he later came to believe that the purpose of the "box", which he called a "chiller," was actually to cool the plate by blowing air on the plate.  In Mr. Hull's view, this meant that MacDermid was infringing DuPont's '454 Patent and, in particular, the language in claim 17 regarding "maintaining" a temperature differential between the substrate and the heated composition layer. He testified that MacDermid personnel told him that there would be infringement of the '454 Patent "if I blow cold air on a plate."  He did not say, however, when these statements were made, and the only other evidence of such a statement at trial shows that it was made well after the parties signed the Manufacturing Agreement.  Specifically, a May 17, 2007 MacDermid email to Mr. Hull includes the following: "The issue we have is in direct cooling: no direct cooling of the platen, and no direct cooling of the plate surface, like blowing air.  Having a blanket of ambient/cooler air would need to have a functional purpose similar to gen 1- i.e., increasing the rate of absorption of volatilized materials onto the filter media.  We don't employ direct cooling methods in the Gen 1 unit – any cooling effects seen are just incident to the process of increasing filter efficiency."  (Tr. Ex. 824.)

MacDermid disputed Mr. Hull's characterization of the purpose of the "box," as well as the conclusion Mr. Hull drew from it.  Mr. Cordani testified that the box was a ventilator that was designed to minimize the accumulation of environmentally damaging "goo," and that there

were other differences between Gen I and the '454 Patent that made the temperature issue immaterial to patent infringement.

Mr. Hull testified that he understood patents well and, in fact, has patents of his own. At trial, he displayed his knowledge for the jurors by sparring with Cortron's counsel about the meaning and effect of various claims in the '454 patent. In 2004 and 2005, he and others at Cortron were concerned about the possibility that the Lava machine might infringe DuPont's patents. He and other Cortron witnesses testified that during the negotiations over the Joint Development Agreement in the Fall of 2004, Cortron specifically requested a representation of non-infringement from MacDermid and an indemnity provision for any breach of that representation. This request led to a difficult negotiation with MacDermid. In the end, the parties settled on this language: "MacDermid represents and warrants that any Photopolymer Technology [which the Agreement stated belonged to MacDermid], including designs, specifications, and any products or materials produced by it or its agents or contractors (or any combination of the foregoing) and submitted to Cortron or incorporated into the Equipment or Development Objective shall not knowingly infringe the patent, trademark, mask rights, copyright, or trade secrets rights of a third party." (Tr. Ex. 1, Sec. 7.2.) Cortron made a similar representation with respect to the lighting technology that it was contributing to the collaboration. Each party also agreed to indemnify and defend the other in the event of any claim by a third party that its technology infringed the third party's proprietary or other rights. (*Id*. Sec. 8.2.)

The purpose of the November 2004 Joint Development Agreement was to develop a new generation of thermal flexographic processor – which became known at trial as "Gen II" – that incorporated the technology of both parties; due to technical problems, however, this processor

was never actually built in final form and was never sold.  Although they ultimately incorporated

some re-engineering and refining by Cortron, the Lava machines that Cortron actually built for

MacDermid and that MacDermid actually sold – referred to at trial as "Gen I" – were based on

MacDermid's prototype, the same prototype that Frank Hull had inspected in California.  It was

Cortron's work in building Gen I machines for MacDermid that led DuPont to sue Cortron for

patent infringement in 2008.  Cortron's work on the Gen I machines was initially governed by

the April 2005 Manufacturing Agreement and later by individual purchase orders.  Before that

Agreement was signed, however, there was further discussion of patent issues between the

parties.

In January 2005, Marc Fioravanti, a Cortron executive, wrote to Timothy Gotsick,

MacDermid's head of research and development, requesting documents related to the DuPont

patents so that Mr. Hull could study this material:

> If you recall your attorney was dead set against any indemnification [during
> negotiation of the Joint Development Agreement].  We gave more than we would
> have liked in this area.  Because of that Frank Hull has some concerns and would
> like to review the DuPont patents as they relate to our exposure which is limited
> currently to the 360 product.  One way Frank could do his research is to have our
> patent attorney do some research, but we were hoping MacDermid could furnish
> us with the patent documentation.

(Tr. Ex. 568.)  In response to this email, Mr. Gotsick gave instructions that the information on

the "relevant thermal patents," meaning DuPont's patents, be provided to Cortron, and Mr. Hull

reviewed the information.

In March 2005, MacDermid obtained an opinion from outside counsel that its then-

existing designs for the Lava machine did not infringe DuPont's '454 patent, which, as noted,

had been issued in September 2004.  There was no evidence that MacDermid shared this opinion

with Cortron at the time.  The opinion was marked at trial but not admitted into evidence.  On

cross-examination, Mr. Cordani testified that the opinion was provided before MacDermid and Cortron had finalized the design for the Gen I machine that would ultimately be built by Cortron.

As noted, MacDermid and Cortron entered into the Manufacturing Agreement in April 2005. Under the Agreement, Cortron would build seven Gen I machines using MacDermid's designs. With regard to patent infringement, the Agreement included the following provision: "MacDermid represents and warrants that MacDermid's specific designs for these specific pieces of Equipment [i.e., the Gen I machines] themselves do not violate the intellectual property rights of any third party." (Tr. Ex. 2, Sec. 3.2.) MacDermid agreed to indemnify Cortron for any breach of this provision. (*Id*. Sec. 3.3.)

In October 2005, Cortron obtained an opinion from its own outside counsel that the "proposed Cortron flexographic plate processing designs" did not infringe the '454 Patent or another DuPont patent. (Tr. Ex. 34.) MacDermid paid for half the cost of obtaining this opinion, which was admitted into evidence at trial. (Id.) Mr. Hull testified that this opinion related only to Gen II, which incorporated different technology than the Gen I machine with respect to the temperature issue discussed above. Nonetheless, the opinion itself – which spans 35 single-spaced pages and includes several pages of discussion of patent law – sets forth a construction of key language of the claims of the '454 Patent relating to the temperature issue. Specifically, as noted above, much of the debate at trial concerned language in claim 17 (and other claims) of the '454 Patent regarding "maintaining the temperature" of the substrate such that it remained below the temperature of another layer to "control thermal distortion" of the plate. The legal opinion from Cortron's attorneys identified "maintaining" as one of the claim terms that had to be construed to conduct the infringement analysis. The opinion consulted various dictionary definitions and other sources, and concluded that "proper construction of the 'maintaining'

limitation of claim 17 requires active control of temperature altering elements in order to keep the temperature of the exterior surface of the flexible substrate 20 [degrees Fahrenheit] below the temperature of the exterior surface of the composition layer."  (Tr. Ex. 34 at 26.)  MacDermid argued at trial that its Gen I machine did not utilize "active" temperature control.  This issue is discussed further below.

## DISCUSSION

### 1.  The Representation of Non-Infringement  Was Not a Statement of Fact

To be liable for fraud or negligent misrepresentation under Connecticut law, the defendant must make a statement of fact and, in particular, "a statement of a material past or present fact."  *Omega Eng'g, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1097 (D. Conn. 1995) (internal quotation marks and citation omitted).  "Statements of opinion are not actionable," *id.* (internal quotation marks and citation omitted), unless the speaker is a fiduciary or has special skill or expertise in the subject matter or unless the recipient is "for some other special reason particularly susceptible to a misrepresentation of the type involved."  Restatement (Second) of Contracts, § 169; *see Lestorti v. DeLeo*, 298 Conn. 466, 475 n.8 (2010) ("We also frequently have relied on the Restatement (Second) of Contracts.").  In addition, "[i]f it is reasonable to do so, the recipient of an assertion of a person's opinion as to facts not disclosed and not otherwise known to the recipient may properly interpret it as an assertion (a) that the facts known to that person are not incompatible with his opinion, or (b) that he knows facts sufficient to justify him in forming it."  Restatement (Second) of Contracts, § 168(2).

"Many statements of law involve assertions as to what a court would determine to be the legal consequences of a dispute if it were litigated, and such a statement is one of opinion."  Restatement (Second) of Contracts, § 170, Cmt. B; *see also* Restatement of the Law (Second),

Torts ("[I]f all the pertinent facts are known and there is no misrepresentation of the existence or nonexistence of a pertinent statute or judicial decision, the statement of the legal consequences of those facts is a statement of opinion as to what a court would determine to be the legal consequences of the facts if the matter were litigated."); *see also Utah Power & Light Co. v. Federal Insurance Company*, 983 F.2d 1549, 1556 (10th Cir. 1993) (insurer could not rescind policy for fraud on basis of insured's statement that personal injury lawsuit brought against related party "should be successfully defended as Workers Comp. is sole remedy under Utah law," in part because "no one can be deceived by a misrepresentation of law because everyone has access to the law and may be presumed to know it"); *Cain v. Osman*, 286 Fed. App'x 934 (7th Cir. 2008) (finding under Illinois law that attorney's statement that he did not believe prospective client "had a viable action under the False Claims Act" was "a legal opinion, not a representation of fact" and could not support prospective client's fraud claim).

Ultimately, "[t]he test for whether a statement is one of opinion or fact is whether 'under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion.'" *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) (quoting *Crowther v. Guidone*, 183 Conn. 464, 468 (1981)).

In this case, a reasonable juror considering the circumstances surrounding MacDermid's representation in the Manufacturing Agreement that its "specific designs for these specific pieces of Equipment themselves do not violate the intellectual property rights of any third party" would have to conclude that this was a statement of opinion, not fact.[3]

---

[3] MacDermid's earlier representation in the Joint Development Agreement that "any Photopolymer Technology . . . shall not knowingly infringe the patent . . . rights of a third party" is not actionable, because (1) there was no evidence that it was breached, and (2) any breach could not have harmed Cortron. There was no evidence that DuPont's patent infringement lawsuit against Cortron concerned the Gen II machine contemplated by the Joint Development Agreement, and because the parties never finally developed, used, or sold that machine, it likely could not have. *See* 35 U.S.C. § 271 (patent infringement element requires that infringer "makes, uses, offers to sell, or sells any patented invention"). Cortron's counterclaims also assert that MacDermid made similar non-infringement

First, when the representation was made in April 2005, there had been no determination by any court that MacDermid's Lava machines, or the accompanying designs, infringed any third party rights. (As noted, there has been no such determination to this day.)  Indeed, other than a few prototypes, MacDermid had not yet built any Lava machines; the purpose of the Manufacturing Agreement was to hire Cortron to build the first machines for market.  Cortron did not dispute any of this at trial, and thus its theory apparently was that MacDermid's representation was untrue in the sense that any court faced in the future with the facts known to MacDermid about its existing designs for the Gen I machine would have had to conclude that the machine would infringe DuPont's patent.

Second, by the time Cortron entered into the Manufacturing Agreement in April 2005, it was well-armed with the relevant facts.  MacDermid had sent to Mr. Hull, who understood patents well, documents regarding the '454 Patent in January 2005, and Mr. Hull had personally inspected the prototype Lava machine in California.  Further, Cortron could have – but chose not to – obtain its own legal advice as to whether or not the Gen I machines infringed before entering into the Manufacturing Agreement – as evidenced by Mr. Fioravanti's January 2005 email (Tr. Ex. 568 ("One way Frank could do his research is to have our patent attorney do some research . . . ."), and the fact that Cortron later obtained such advice with regard to Gen II.  *See* Restatement (Second) of Contracts § 170, Cmt. B ("Thus, as between the two parties to a contract, the recipient is ordinarily expected to draw his own conclusions or to seek his own

---

representations orally.  Although the Court does not recall specific testimony to this effect, it will assume for purposes of this decision that such oral representations were made, although it notes that oral representations made before the signing of the Joint Development Agreement likely would be not be actionable due to the presence in that agreement of an integration clause.  *W. Dermatology Consultants, P.C. v. Vitalworks, Inc.*, 78 A.3d 167, 186 (Conn. App. 2013) (because oral representations were made prior to signing of contract and because they were superseded by merger clause, trial court's finding that plaintiff reasonably relied on them and thereby satisfied the elements of negligent misrepresentation was clearly erroneous).  In any event, the substance of all the representations of non-infringement – oral and written – is the same: MacDermid told Cortron, in effect, that its Lava machine did not infringe any of DuPont's patents.  There was no evidence at trial suggesting that the minor wording differences between the various formulations of this representation were material.

independent legal advice."); *id.* § 169, Cmt. B ("If the subject matter of the transaction is one on which the two parties have roughly equal skill and judgment, each must generally form his own opinions and neither is justified in relying on the other's . . . .  The mere fact that one of the parties is less astute than the other does not justify him in relying on the other's opinion.  This is true even though one party knows that the other is somewhat more conversant with the value and quality of the subject matter, since expressions of opinion by the other party are generally to be discounted."); *see also Aurora v. Green*, 467 N.E.2d 610, 613 (Ill. App. Ct., 2d Dist., 1984) (As a general rule, one is not entitled to rely upon a representation of law *since both parties are presumed to be equally capable of knowing and interpreting the law.*" (emphasis added)).

Third, because the particular DuPont patent that underlies Cortron's fraud and negligent misrepresentation claims – the '454 Patent – was issued only six months before MacDermid made the representation in the Manufacturing Agreement, and because there was no evidence that any of its claims had at the time been construed by any court, a high level of uncertainty was inherent in the representation of non-infringement.  Claim construction is an essential step in any patent infringement lawsuit.  *Cybor Corp. v. Fas. Techs.*, 138 F.3d 1448, 1454 ("An infringement analysis involves two steps.  First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." (internal citations omitted)).[4]  Claim construction is a task for judges, not juries.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996) ("Patent construction in particular is a special occupation, requiring, like all others, special training and

---

[4] "The point of claim construction is to instruct the jury on what the claim means from the perspective of a person having ordinary skill in the art."  Menell et al., *Patent Case Management Judicial Guide*, 2d Ed. (2012, Sec. 5.2.3.1.2 at 5-49).  Claim construction may not be necessary where there is no dispute over the meaning of the claims or where "the perspective of a person having ordinary skill in the art would add nothing to the analysis."  *Id.*  Neither circumstance applies here, as the trial evidence showed that the meaning of the claim term "maintaining" with respect to temperature was disputed and a construction of that term would help a jury charged with determining whether or not there was infringement.  Cortron's own counsel devoted a portion of its legal opinion to the construction of this term.  (Tr. Ex. 34, pp. 24-26.)

practice.   The judge, from his training and discipline, is more likely to give a proper interpretation to such instruments than a jury; and he is, therefore, more likely to be right, in performing such a duty, than a jury can be expected to be.").   While debate surrounds the question whether claim construction is purely a question of law or, in the words of the Supreme Court, a "mongrel practice" incorporating both law and fact, *id.* at 378, *compare Cybor Corp.*, 138 F.3d at 1456 ("[A]s a purely legal question, we review claim construction de novo on appeal . . . .") *with Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 134 S. Ct. 1761, No. 13-854 (Mar. 31, 2014) (granting certiorari to decide whether "a district court's factual finding in support of its construction of a patent claim term may be reviewed *de novo*, as the Federal Circuit requires . . . , or only for clear error, as Rule 52(a) requires"), it indisputably includes a legal component requiring the translation of claim language into plain English for jurors.  *See, e.g.*, Model Patent Jury Instructions,  Menell et al., Patent Case Management Judicial Guide, 2d Ed. (2012), App. E ("I have already determined the meaning of the claims of the [ ] patent.  You have been given a document reflecting those meanings . . . .   You are to apply my definitions of these terms throughout this case.").

And that legal component is no walk in the park.  Claim construction often poses a formidable challenge even to experienced judges, whose frequent disagreement with each other on construction issues has injected a widely lamented strain of uncertainty into patent infringement cases.  *See* Kimberly A. Moore, *Markman Eight Years Later: Is Claim Construction More Predictable?*, 9 LEWIS & CLARK L. REV. 231, 233 (2005) (calculating Federal Circuit's reversal rate of district court claim constructions from 1996 through 2003 to be 34.5% and concluding that "criticism over the lack of guidance and unpredictability caused by the current claim construction process is warranted"); Gretchen A. Bender, *Uncertainty and*

*Unpredictability in Patent Litigation: The Time is Ripe for A Consistent Claim Construction Methodology*, 8 J. INTELL. PROP. L. 175, Spring, 2001 ("[T]he field of patent infringement litigation currently lacks the certainty and predictability necessary to efficiently litigate (and resolve) cases."); Brief of Professors Peter S. Menell, J. Jonas Anderson, and Arti K. Rai as Amici Curiae in Support of Neither Party 15, 17, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, No. 13-854 (cert. granted March 31, 2014) (noting that "[a]n unusually high reversal rate for claim construction rulings following the *Cybor* decision signaled dissensus" and that although reversal rates have fallen somewhat, "[t]he shadow of formal de novo review continues to cast doubt on the predictability of patent litigation . . . ."). The uncertainty of an outcome predicted by an assertion and the potential for disagreement with the assertion are both signs that the assertion is one of opinion rather than fact. Restatement (Second) of Contracts, § 168(1) ("An assertion is one of opinion if it expresses only a belief, without certainty, as to the existence of a fact . . . ."); *id*. Cmt. B. ("The fact that points of view may be expected differ on the subject of a statement suggests that the statement is one of opinion."); *Rohr v. Allstate Fin. Servs.*, 529 Fed. App'x 936, 942 (10th Cir. 2013) (affirming district court's finding that plaintiff could not have reasonably relied on speaker's statements that were "opinions predicting uncertain future conditions" and where each representation at issue "concerned predictions, rather than claims about current conditions").

Fourth, Cortron was well aware of the uncertainty inherent in MacDermid's representation of non-infringement, and well aware that others, such as DuPont, might disagree with it. That is why Cortron insisted on inspecting MacDermid's prototype and reviewing DuPont's patents before entering into the Manufacturing Agreement, and that is why it negotiated an indemnity provision in the Manufacturing Agreement to protect itself in the event

15

the representation turned out to be wrong.  (Tr. Ex. 2 (Manufacturing Agreement, Sec. 3.3: "Each party hereby agrees to indemnify the other party for any damages suffered by the other party as a result of the breach of the representations and warranties provided herein as they apply to the specific pieces of Equipment manufactured hereunder.").)  Cortron's recognition of the uncertainty surrounding the extent of DuPont's patents also led it to seek its own legal advice with respect to Gen II, the project to which it was contributing its own technology.  Not coincidentally, during the trial both sides referred to the legal advice received from Cortron's outside counsel, as well as the Gen I-related advice received from MacDermid's outside counsel, as "*legal opinions*."  *Compare Apache Tribe of Oklahoma v. Brown*, 966 F.Supp.2d 1188, 1194-95 (W.D. Okla. 2013) (allegations that outside law firm rendered incorrect legal opinions as to validity of corporate resolution, corporate authority, validity of loan agreement, and invalidity of another loan agreement were insufficient to state predicate acts of fraud for RICO claim as they did not set forth false representations of material fact on which plaintiff could have relied).

Cortron did not simply take MacDermid at its word that this new product did not infringe a new patent whose claims had never been construed, and the uncertainty inherent in such a statement would have made it unreasonable for Cortron to do so.  *See Omega Eng'g Inc.*, 908 F. Supp. at 1097 ("Reliance on opinions is per se unjustifiable because opinions, unlike facts, do not purport to be incontrovertible.").  Rather, Cortron did its homework and then bargained for specific protection against the risk that a court might find that the product infringed DuPont's patent.

For all these reasons, a reasonable juror would have to conclude that, "under the circumstances surrounding" the representation of non-infringement in the Manufacturing

Agreement, "the representation was intended and understood as one of fact as distinguished from one of opinion." *Woodling*, 813 F.2d at 552.

## 2. No Evidence that MacDermid Was Aware of Facts Incompatible with Opinion

Nor did the trial evidence provide a reasonable juror with a basis to conclude that MacDermid was aware of facts in April 2005 that were incompatible with its opinion that the Gen I machine did not infringe DuPont's '454 Patent. *See* Restatement (Second) of Contracts, § 168(2) ("If it is reasonable to do so, the recipient of an assertion of a person's opinion as to facts not disclosed and not otherwise known to the recipient may properly interpret it as an assertion . . . that the facts known to that person are not incompatible with his opinion . . . ."). Cortron relies on the October 2003 email discussing temperatures in connection with the development of the prototype Gen I machine, including the query "[a]ny idea where [the temperatures] would go if the chiller was turned off?" and the statement "I'm thinking patent issues with that last remark." (Tr. Ex. 818.) But this is not evidence that MacDermid was aware of facts incompatible with its April 2005 opinion that Gen I did not infringe. First, these comments amount to no more than musings during trial-and-error testing of a new product, and can hardly be called "facts" at all. Second, the reference to "patent issues" is a far cry from an admission of infringement and instead reflects, at most, an awareness of areas that might lead to claims of infringement. Adding to the uncertainty of the environment in which these comments is the fact that in October 2003, the Patent and Trademark Office had not even issued the '454 Patent, although MacDermid was apparently aware of DuPont's then-pending application. Especially given the uncertainty surrounding patent litigation in general and the yet-to-be-construed claims of what would become the '454 Patent in particular, no reasonable juror could find that an employee's musings in October 2003 that certain temperature-related observations might raise "patent

issues" were so clearly incompatible with MacDermid's April 2005 non-infringement opinion as to make that opinion fraudulent.

At trial, Cortron also made much of Mr. Markhart's statement to Mr. Hull during the California visit that the purpose of the separate box was to "keep the machine green," coupled with later statements in which MacDermid arguably acknowledged that it could not "blow cold air" to cool the plate. There was no evidence, however, that Mr. Markhart or anyone else at MacDermid knew, when he made the statement about the purpose of the box, (1) that use of the box actually involved blowing cold air to cool the plate – an assertion that MacDermid disputed both at trial and in its May 2007 email, quoted above, in which it stated, like Mr. Cordani at trial, that the purpose of any "ambient air" was to protect the environment, i.e., to minimize the build-up of "goo;" or (2) that blowing cold air to cool the plate actually amounted to infringement of the '454 Patent. While the May 2007 email would justify an inference that MacDermid was aware – when the email was written – that it should not "blow cold air" to cool the plate (Tr. Ex. 824 ("[N]o direct cooling of the platen, and no direct cooling of the plate surface, like blowing air"), that was two years after the representation of non-infringement was made. *See Alliance Group Servs., Inc. v. Grassi & Co.*, 406 F. Supp.2d 157, 167 (D. Conn. 2005)(granting summary judgment on fraud claim because plaintiff had produced no evidence that defendant "knew any representations it made were false at the time they were made").

Further, awareness that the company should not do something does not, at least in this context, amount to awareness of a fact compelling a finding of infringement. A reasonable juror could not infer from the statements in the May 2007 email that MacDermid knew, even at that time, that the Gen I machine would infringe the '454 Patent if it blew air on the plate surface to cool the plate. Those statements would have supported only the more modest inference that

MacDermid employees were acknowledging that they should not, consistent with their counsel's advice and to avoid increasing the risk of a lawsuit, "blow[] air" to cool the plate surface. *That* inference would find additional support in the evidence, specifically, Mr. Cordani's testimony that he helped sensitize MacDermid engineers to patent issues and assisted in identifying ways to "design around" them during the research and development process. But especially in light of the uncertainty surrounding patent infringement litigation in general and the as-yet-un-construed '454 Patent in particular, awareness of "patent issues" or designs that might spur *claims* of infringement is a step removed from awareness of a fact that would compel or make probable a *finding* of infringement.

In this case, taking that step would have involved the uncertain process of construing the phrase "maintaining the temperature" in the claims of the '454 Patent. The evidence at trial on that point foreclosed the notion that "blowing cold air to cool the plate" was a fact so clearly incompatible with the representation of non-infringement as to make that representation untrue or misleading. MacDermid argued that, under a proper claim construction, the limitation in claim 17 and other claims of the '454 Patent regarding "maintaining the temperature" differential between the substrate and the heated composition layer required not only active control of the temperature differential but also *monitoring* of the temperature, for example, with a thermostat – which, the parties agreed, Gen I did not utilize. MacDermid's claim construction found support in the construction of the "maintaining" claim language in the October 2005 opinion of Cortron's outside counsel (even though that opinion related specifically to Gen II, rather than Gen I):

> Per the claim construction of the term "maintaining" above, [the relevant claim of the '454 Patent] requires actively controlling temperature altering elements to keep the exterior surface of the flexible substrate at a temperature 20 [degrees Fahrenheit] below the temperature of the exterior surface of the composition layer. Cortron's proposed flexographic processing designs do not actively control the exterior surface temperature of the flexible substrate. For example, Cortron's

proposed designs *do not monitor temperatures* associated with the flexible substrate or image side of the flexographic plate, and do not act to actively control the temperature of the heaters (within the heated element) such that at least a 20 [degrees Fahrenheit] temperature difference is maintained between the exterior surface of the flexible substrate and the image side of the flexographic plate.

(Tr. Ex. 34 at 28-29 (emphasis added).)  Because the Gen I machine did not monitor temperature, it would, at least according to this interpretation, not infringe even if it did "blow cold air to cool the plate."  One need not agree with this claim construction to see that it stands as an obstacle between the "fact" of blowing cold air on a plate and a finding of infringement – because blowing cold air on a plate by itself does not entail monitoring and thus, arguably, "maintaining." No court has yet assessed this claim construction, and I take no position on it either, except to say that it persists as an element of uncertainty in the as-yet-unresolved issue whether the Gen I machine infringes DuPont's '454 Patent.  That uncertainty would prevent a reasonable juror from concluding that, even had MacDermid admitted that it knew in April 2005 that it was "blowing cold air to cool the plate" – and there is no evidence that MacDermid ever made such an admission – that meant it knew that it was actually infringing the '454 Patent.

## CONCLUSION

Because proof of a statement of fact is an essential element of both fraudulent and negligent misrepresentation, and because such proof was missing with respect to the representation of non-infringement in the Manufacturing Agreement, I declined to submit those claims of fraudulent and negligent misrepresentation to the jury.  Accordingly, MacDermid's motion for judgment as a matter of law under Rule 50(a) [#397] is GRANTED IN PART.  In light of the jury's verdict, the remainder of that motion is DENIED as moot.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                August 12, 2014