UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MACDERMID PRINTING SOLUTIONS, LLC, | : | Case No. 3:08-cv-01649 (MPS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CORTRON CORPORATION, | : | |
| Defendant. | : | January 20, 2015 |

_____

**RULING ON POST-VERDICT MOTIONS**

## I.   Introduction

This ruling represents a denouement in a long-running battle between two former joint

venture partners whose relationship soured after years of collaboration. After a trial last summer,

the jury found all of the issues in favor of the Plaintiff/Counterclaim Defendant, MacDermid

Printing Solutions, LLC ("MacDermid"), and against Defendant/Counterclaim Plaintiff Cortron

Corporation ("Cortron"), awarding MacDermid $35,423,997 in compensatory damages. The

parties have filed post-verdict motions requesting various forms of relief. Cortron has renewed

its motion for judgment as a matter of law and has also moved, in the alternative, for a new trial

or remittitur of the jury's damages award. MacDermid has filed a motion for punitive damages,

attorney's fees, costs, offer-of-compromise interest, and declaratory and injunctive relief. For the

reasons detailed herein, the Court denies Cortron's motion for judgment as a matter of law, and

denies its motion for a new trial provided that MacDermid agree to a remitted award of

$19,757,854 in compensatory damages. MacDermid's motion is granted in part and denied in

part, and the Court awards $27,538,889 in punitive damages (which includes treble antitrust

damages). The Court will rule separately on the matter of attorney's fees and offer-of-

compromise interest, once the parties have filed the supporting documentation and response required by the Court's January 14, 2015 order, ECF No. 466.

## II.    Facts the Jury Reasonably Could Have Found

The jury could reasonably have found the following facts. Beginning in 2002, MacDermid began developing a thermal flexographic processor, a relatively new technology that is employed to create plates for use in the labeling of commercial packaging, such as potato chip bags. At that time, E. I. du Pont de Nemours and Company ("DuPont") was the only producer of thermal flexographic processors. In 2004, MacDermid introduced its "LAVA" thermal flexographic processor as a competitor to DuPont's product.

To enhance and bring to market its thermal flexographic processors, MacDermid entered into two contracts with Cortron: Under the Joint Development Agreement (November 10, 2004), MacDermid would pay Cortron to develop a second-generation LAVA processor that would incorporate technology from both for MacDermid and Cortron. Under the Manufacturing Agreement (April 14, 2005), MacDermid would pay Cortron to manufacture first-generation LAVA machines for MacDermid, and Cortron would safeguard MacDermid's proprietary information.

On April 1, 2008, DuPont filed a lawsuit against Cortron in the United States District Court for the District of Minnesota, alleging that Cortron's work with MacDermid infringed one of Dupont's patents. After attending a meeting with DuPont on April 1, 2008, Cortron and DuPont settled the lawsuit in an agreement that was signed in early June 2008. In the settlement agreement, Cortron agreed, among other things, "to deliver and/or make available to DuPont . . . all Technical Information relating to all Thermal Technology" and "to immediately cease manufacturing, selling, and offering to sell all Thermal Technology, as well as to immediately

cease and desist providing all services and/or technical support for any Thermal Technology." In other words, Cortron was to cease building the LAVA machines or otherwise working with MacDermid on thermal processor technology, and was to hand over all such technology and related information in its possession to DuPont.  In exchange, DuPont agreed, among other things, to indemnify Cortron against any lawsuit brought by MacDermid. In addition, in a separate Equipment Purchasing Master Agreement also entered into in early June 2008, DuPont agreed to pay Cortron $20,000 per month for seven months for designing and developing certain equipment related to DuPont's products. Tr. Ex. 119.

On July 30, 2008, DuPont issued a press release announcing its settlement with Cortron:

> Under the terms of the agreement, Cortron, based in Minnesota, agrees to immediately cease manufacturing LAVA thermal flexographic printing plate processors, as well as to immediately discontinue providing all service, spare parts, and technical support for any LAVA equipment used to thermally develop flexographic printing plates. Thermal processing equipment manufactured by Cortron has been marketed and sold by MacDermid Printing Solutions, LLC under the LAVA trade name.

Press Release, ECF No. 242-6. At trial, Cortron's expert witness agreed that the purpose of the press release was to discourage customers from buying MacDermid's LAVA processors. Trial Tr. 935.

Subsequent to this settlement agreement, Cortron gave DuPont the technical information relating to LAVA technology, and then deleted these engineering data from its computer systems. About five months after the press release was issued, at some point in late 2008 or early 2009, Cortron ceased all operations and closed its doors.

MacDermid brought this action against Cortron, claiming that the Cortron-DuPont settlement was a conspiracy in violation of state and federal antitrust laws and one that entailed the transfer of MacDermid's trade secrets from Cortron to DuPont, the subsequent destruction of

3

those secrets, and breaches of Cortron's obligations under the Joint Development and

Manufacturing Agreements. Cortron counterclaimed, alleging, among other things, that

MacDermid had (i) breached the contract, (ii) fraudulently misrepresented that its technology did

not infringe the intellectual property rights of third parties, and (iii) negligently made the same

misrepresentation.[1]

The case was tried in June and early July of 2014. On July 3, 2014, after the close of

evidence, Cortron moved for a directed verdict. On July 8, 2014, a jury rendered a verdict for

MacDermid, awarding $35,423,997 in damages on its antitrust, breach of contract, trade secrets,

and other claims, and finding against Cortron on all of its counterclaims. Cortron has now

renewed its earlier motion for a directed verdict, asking for judgment as a matter of law

notwithstanding the verdict. Cortron also moves, in the alternative, for a new trial or remittitur of

the jury's award. MacDermid has filed a motion for punitive damages, attorney's fees, costs,

offer-of-compromise interest, and declaratory and injunctive relief.

### III.    Whether Cortron Is Entitled to Judgment as a Matter of Law

Cortron has moved for judgment as a matter of law notwithstanding the jury's verdict on

MacDermid's claims under federal antitrust law, state antitrust law, the state computer crimes

statute, Conn. Gen. Stat. §§ 53a-251 and 52-570b, the Connecticut Uniform Trade Secrets Act,

Conn. Gen. Stat. §§ 35-51 et seq. ("CUTSA"), and the Connecticut Unfair Trade Practices Act,

Conn. Gen. Stat. §§ 42-110a et seq. ("CUTPA").[2] The Court finds that Cortron has waived many

of its arguments by failing to raise them as part of its original motion for a directed verdict, and

that reaching those unpreserved arguments is not necessary to prevent manifest injustice. After

---

[1] This Court granted MacDermid's motion for judgment as a matter of law as to the fraudulent and negligent misrepresentation claims. ECF No. 429.
[2] Cortron has not challenged the portion of the jury's verdict finding it liable for breach of contract.  *See* Unredacted Mem. L. Supp. Renewed Mot. JMOL & New Tr. or Remit. (ECF No. 440), at 31.

4

considering Cortron's preserved arguments, the Court concludes that the jury's verdict was based on legally sufficient evidence. Cortron's motion for judgment as a matter of law is denied as to all counts.

### A.      Legal Standard

Entering judgment as a matter of law notwithstanding the verdict is proper "only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 106 (2d Cir. 2014) (quotation marks omitted). "[T]here must be such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Id.* at 106-07 (same).

"Federal Rule of Civil Procedure 50(b) generally proscribes judgment n.o.v. on any ground not specifically raised in an earlier motion for a directed verdict at the close of all the evidence." *Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 112 (2d Cir. 1996) (citations and quotation marks omitted). Judgment as a matter of law is not available where "defendants gambled on the jury's verdict and only later, having lost, decided to raise their alternative argument." *Meriwether v. Coughlin*, 879 F.2d 1037, 1044 (2d Cir. 1989) (same). "The ultimate question is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof. If specificity was lacking, JMOL may neither be granted by the district court nor upheld on appeal unless that result is required to prevent manifest injustice."[3] *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286-87 (2d Cir. 1998) (same).

---

[3] Failure to raise a specific argument has been excused where the trial judge "intervened and on his own discussed the . . . issue," which had already been raised on the "summary judgment motion and . . . was the central issue at trial." *Gordon v. Cnty. of Rockland*, 110 F.3d 886, 887 n.2 (2d Cir. 1997); *see also Blockel v. J.C. Penney Co.*, 337

"Manifest injustice exists where a jury's verdict is wholly without legal support." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). To demonstrate "manifest injustice," "the standard for granting judgment as a matter of law is elevated." *Id.* The Second Circuit has found manifest injustice where the nonmoving party "did not (*and could not*) present evidence to sustain a verdict," *Weible*, 92 F.3d at 114 (emphasis added), but not where, "had [the moving party] raised the issue at trial, it may be that [the nonmoving party] would have been able to present additional evidence," *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

Even if injustice is found, "the court should normally grant a new trial," and should only enter judgment as a matter of law if "a new trial could not result in a verdict in favor of the non-moving party, as when, for example, the defendant has immunity from a claim for the type of damages sought." *Baskin v. Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986); *see also Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 271 (2d Cir. 2011) ("[B]ecause appellees failed to move for a directed verdict, they are limited to seeking a new trial, which we will grant only if necessary to prevent manifest injustice when a jury's verdict is wholly without legal support.") (quotation marks omitted); *Bailey v. New York City Dep't of Transp.*, 173 F.3d 843, at *1 (2d Cir. 1999) ("Bailey failed to make a Fed.R.Civ.P. 50(a) motion for directed verdict at the close of the evidence and is therefore not permitted to appeal the verdict based on the insufficiency of the evidence. However, this court may order a new trial to prevent a manifest injustice in cases where a jury's verdict is wholly without legal support.") (citations and quotation marks omitted).

---

F.3d 17, 25 (1st Cir. 2003) ("[T]he district court foreclosed J.C. Penney's opportunity to make its arguments with any specificity. Under these circumstances J.C. Penney cannot be faulted for failing to provide more detail.").

### B.    Antitrust Counts

Cortron challenges the legal sufficiency of MacDermid's evidence on the antitrust claims. In order to prevail on its antitrust claims, MacDermid was required to prove both that Cortron violated the antitrust law, by conspiring to unreasonably restrain trade, *see In re Nasdaq Mkt.-Makers Antitrust Litig.*, 894 F. Supp. 703, 710 (S.D.N.Y. 1995), and that MacDermid itself suffered an injury flowing from the antitrust violation, *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007).[4] Cortron argues that MacDermid provided no legally sufficient evidence of either an unreasonable restraint of trade or an antitrust injury to itself. As discussed below, several of Cortron's arguments on this point were not raised as part of its motion for a directed verdict and are therefore waived, and Cortron's preserved arguments are without merit.

### i.    Cortron's Unpreserved Grounds for Judgment as a Matter of Law on the Antitrust Counts

In its oral motion for a directed verdict before the Court on July 3, 2014, trial counsel for Cortron argued that the antitrust claim was legally insufficient because there was no evidence that the supply of thermal flexographic printers was impacted by Cortron's actions, and therefore no proof of injury to MacDermid or an anticompetitive effect on consumers. *See* Trial Tr. 2173 ("Basically zero proof of damages. Zero proof of harm to consumers."); *id.* at 2171-74 ("There is no dispute that there was not a single unfulfilled order throughout that time period. We haven't heard from a single customer, a single sales rep that said there was actually an impact. . . . There was always a supply."). In its renewed motion for judgment as a matter of law, Cortron has again

---

[4] The Court will discuss the state and federal antitrust counts together, as the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24 to 35-46, generally is construed to follow federal antitrust law. Conn. Gen. Stat. § 35-44b ("It is the intent of the general assembly that in construing [the Connecticut Antitrust Act] the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."). The primary difference pertinent to this case is that for federal liability, a plaintiff must also show an effect on interstate commerce, an issue that has not been challenged by Cortron.

made this argument, which the Court considers below. *See infra* Subsection III.B.ii. But Cortron

has also added novel legal arguments substantially beyond the original motion for a directed

verdict and any arguments reasonably incorporated into that motion by reference. The Court

finds that these added arguments are unpreserved and that entering judgment as a matter of law

on the basis of those arguments is not necessary to prevent manifest injustice.

"A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting

another is insufficient to preserve a JMOL argument based on the latter." *Lore v. City of

Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012). The fact that Cortron made *some* pre-verdict

argument about the legal sufficiency of MacDermid's proof on the antitrust claims does not

mean that it is proper for this Court now to consider *any* such arguments. *See id.* (holding that the

defendant had waived the argument that the plaintiff "failed to present evidence of causation"

even though the defendant had requested a directed verdict "on the ground of lack of evidence on

other specified issues"); *Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770, 778 (S.D.N.Y.

1984) (holding that the defendants in an antitrust case had waived a challenge to the legal

sufficiency of evidence of artificial pricing by failing to make that argument in their directed

verdict motion, even though the directed verdict motion did challenge the sufficiency of evidence

of a conspiracy).

One of Cortron's unpreserved arguments is that injury to MacDermid, in the form of lost

sales, was not proven because the proof that MacDermid offered—expert testimony by Dr.

James A. Levinsohn—was based on data analysis that yielded statistically insignificant results

using a 95% confidence interval. Cortron Mot., at 7-9. Even if the probabilistic nature of Dr.

Levinsohn's analysis were to render his testimony so unreliable as to be legally insufficient—

which the Court doubts—Cortron's general reference to "zero proof of damages" in the directed

verdict colloquy was not specific enough to put the Court and MacDermid on notice that Cortron was challenging this aspect of Dr. Levinsohn's analysis, particularly given that the argument was absent from Cortron's earlier *Daubert* motion to preclude Dr. Levinsohn's testimony. *See* ECF No. 299.

Cortron also now attacks the legal sufficiency of items of evidence that MacDermid used to show an unreasonable restraint of trade, raising specific arguments not mentioned during the directed verdict colloquy directly or by reference to earlier stages of the case. First, Cortron argues that the DuPont press release is a form of commercial speech and therefore presumptively not valid evidence of antitrust violation, citing *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/& Am. Home Products Corp.*, 850 F.2d 904, 916 (2d Cir. 1988) (setting a presumption that "misleading advertising" has a *de minimis* effect on competition) and the general concern that applying the antitrust laws to commercial speech might be in tension with the First Amendment. Cortron Mot., at 19-22. Not only did Cortron's trial counsel fail to raise this issue during the directed verdict colloquy; he declined to do so even after the Court specifically asked him why the press release was not sufficient evidence to support an antitrust theory. Trial Tr. 2172-73.

Second, Cortron argues that settling a patent infringement claim typically cannot give rise to antitrust liability unless the infringement claim is shown to be baseless or outside the scope of the patent, citing *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 207 (2d Cir. 2006), *abrogated by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013). Cortron Mot., at 22-25. This argument was entirely absent from the directed verdict colloquy.

Another two arguments that Cortron now makes—that the pro-competitive effects of Cortron's actions outweighed the anticompetitive effects, Cortron Mot., at 25-26, and that

MacDermid failed to prove concerted action between DuPont and Cortron, *id.* at 26-27—were also not raised during the directed verdict colloquy, and the Court will not consider them.

Finally, Cortron argues that the verdict under Conn. Gen. Stat. § 35-28 is invalid "because that provision only proscribes conduct constituting a *per se* violation of Sherman Act § 1," citing *Shea v. First Fed. Sav. & Loan Ass'n of New Haven*, 439 A.2d 997, 1007 (Conn. 1981), and this Court has already found that the per se rule of antitrust liability does not apply to this case, *see* Trial Tr. 2199. Aside from being unpreserved, this argument plainly lacks merit. The relevant passage from *Shea* cites language from *Elida, Inc. v. Harmor Realty Corp.* addressing a single subsection of Section 35-28 in the following terms: "Section 35-28*(d)* has no specific counterpart in the federal antitrust laws, but rather, it is considered to be a codification of what have come to be known as 'per se' violations of the Sherman Act." 413 A.2d 1226, 1230 (Conn. 1979) (emphasis added). This language does not speak to the remainder of the statute. More importantly, the quoted language is dicta; the Connecticut Supreme Court actually *held* in *Elida* that the trial court erred in applying the per se rule to a restrictive lease covenant under Section 35-28(d), and that "[t]he 'rule of reason' . . . was the appropriate standard for the trial court to ap[p]ly." 413 A.2d at 1232.

Because a verdict against Cortron on the antitrust claims is not a "manifest injustice" or "wholly without legal support," it would be wrong for this Court to enter a judgment as a matter of law in Cortron's favor on the basis of arguments that Cortron did not raise before the case was submitted to the jury. Whether or not those deficiencies would entitle Cortron to prevail on a *properly preserved* motion for judgment as a matter of law is not the question—if it were, Rule 50's preservation requirement would be a nullity.

10

None of Cortron's claims about MacDermid's evidence, even if assumed to be correct, would have completely precluded a verdict for MacDermid. The kinds of deficiencies in MacDermid's proof that Cortron is now raising could potentially have been cured by additional evidence, had MacDermid been put on notice. It is true that some of these arguments appeared in Cortron's September 9, 2011 motion for summary judgment, *see* ECF No. 235, and September 6, 2013 motion to preclude Dr. Levinsohn's expert testimony, *see* ECF No. 299. But those legal arguments were rejected by the Court in its August 30, 2012 and June 12, 2014 rulings, *see* ECF Nos. 278, 367, and Cortron gave no indication that it was raising parallel challenges to MacDermid's case at the directed verdict stage. Far from preserving the issues, the earlier consideration and rejection of Cortron's arguments actually reinforce the unfairness to MacDermid that would result from entering a judgment for Cortron on the basis of arguments that MacDermid reasonably thought were no longer a bar to a verdict in its favor. If, on the basis of Cortron's unpreserved arguments, it would be unjust to let the jury's verdict stand, then the appropriate remedy would be to order a new trial (a subject the Court addresses below), not to enter a judgment in Cortron's favor. *See Baskin*, 807 F.2d at 1134.

### ii.     Cortron's Preserved Grounds for Judgment as a Matter of Law on the Antitrust Counts

Cortron's preserved ground for judgment of a matter of law ("zero proof of damages") is fairly read to challenge both MacDermid's proof that Cortron's actions had an "adverse effect on competition as a whole in the relevant market," *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (quotation marks omitted), and its proof that it was "injured in [its] business or property" as a result of Cortron's actions, 15 U.S.C. § 15(a). The Court rejects both challenges.

As to injury, MacDermid offered the expert testimony of Dr. Levinsohn, who opined on the basis of his expertise and data analysis that MacDermid's sales of the LAVA machine would have been higher if not for the Cortron-DuPont conspiracy and ensuing press release. The jury was entitled to credit this testimony; in spite of Cortron's criticisms of Dr. Levinsohn's testimony, he was qualified as an expert, and his methods met the *Daubert* standard, as this Court has already found. ECF No. 367. Cortron has cited no authority for its claim that MacDermid must produce "direct evidence" of "specific customers" who were steered away from MacDermid by the press release. Such a rule would erect a serious obstacle to any antitrust theory that posited lost sales from potential customers resulting from a conspiracy to eliminate a competitor through a concerted effort to suppress demand for its products. The loss of *potential* customers will always be difficult to prove by "direct evidence" in the form of testimony from the lost customers themselves; such customers are, by definition, difficult to locate. The law should not prohibit indirect proof of damages when it is the nature of the defendant's wrong to make direct proof of damages difficult to obtain. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application.") (internal citations omitted).

Together with some contemporaneous evidence of MacDermid's own real-time perceptions of how its customers and potential customers were reacting, Trial Tr. 698-700, and the jury's own reasonable inferences about how the press release would be received, Dr. Levinsohn's testimony provided an adequate basis for the jury to conclude both that demand had been suppressed and that the conspiracy and ensuing press release had been a substantial factor

in causing the suppression. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) ("[I]f an act is deemed wrongful because it is believed significantly to increase the risk of a particular injury, we are entitled—in the tort context at least—to presume that such an injury, if it occurred, was caused by the act.").

Second, there was sufficient evidence for the jury to find an adverse effect on competition under rule-of-reason analysis. "Collusion to constrict the options available to [consumers]" can result in a "reduction in choice and diminished quality . . . [which] are present anti-competitive effects." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 224 (2d Cir. 2008); *see also In re Currency Conversion Fee Antitrust Litig.*, No. 05 CIV 7116 (WHP), 2009 WL 151168, at *3-4 (S.D.N.Y. Jan. 21, 2009). A reasonable jury could have found that the conspiracy to lead consumers to believe that MacDermid's LAVA technology was no longer available as an alternative product would have such effects. MacDermid's product differed from DuPont's in an important respect. While DuPont tied the lease of its thermal processor to the sale of its plates, requiring customers to take both products, MacDermid offered consumers the "unbundled" option of purchasing a thermal processor without purchasing plates. Cortron's actions constricted that valuable option for customers who were steered away by the press release, and Levinsohn's testimony provided a reasonable basis for the jury to infer that such customers existed.

MacDermid also presented evidence of DuPont's market power, which completes the picture of the anticompetitive, choice-reducing impact of Cortron's actions. Dr. Levinsohn testified that barriers to entry were high in the market for thermal flexographic processing, and that prior to MacDermid's entry DuPont was essentially alone in the market and able to charge significantly higher prices for its products than it could charge after MacDermid's entry. Trial Tr. 713-20, 758, 775. Cortron's actions therefore not only harmed MacDermid; they chased some

consumers away from the only viable source of non-tied thermal flexographic processors, in an environment in which the development of new sources could not be counted on.

Cortron continues to object to Dr. Levinsohn's definition of the relevant market.[5] But for reasons similar to those already elaborated in the Court's ruling on Cortron's *Daubert* motion, ECF No. 367, there was legally sufficient evidence for the jury to adopt Dr. Levinsohn's market definition as the market for thermal flexographic processors in the United States. In short, Dr. Levinsohn's market definition, the contours of which made DuPont's market share dominant, was supported by evidence of DuPont's actual dominance—its large profit margins and its move to decrease prices once MacDermid entered the same market. There were reasons to question Dr. Levinsohn's opinions, which were raised during cross-examination, but the jury was permitted to credit Dr. Levinsohn in spite of the criticisms.

Having found sufficient evidence to support the challenged elements of MacDermid's antitrust case—injury and anticompetitive effect—the Court denies Cortron's motion for judgment as a matter of law on the antitrust counts.

### C.    Misappropriation of Trade Secrets (CUTSA) Count

Cortron argues that MacDermid's trade secrets claims are legally insufficient because the documents at issue "do not qualify as trade secrets because the undisputed evidence establishes that the information they contain is readily ascertainable by proper means." Cortron Mot., at 27. Because Cortron did not preserve this argument, however, it is not entitled to judgment as a matter of law on this count.

---

[5] Although Cortron did not specifically challenge MacDermid's proof of the "relevant market" in the directed verdict colloquy, its broader challenge to the proof of an anticompetitive effect, in light of more specific arguments about the relevant market raised earlier in its *Daubert* motion, can arguably be construed as raising the issue of the relevant market definition.

Like the antitrust issues, Cortron's "readily ascertainable" point about the trade secrets claims was raised in its September 9, 2011 motion for summary judgment, ECF No. 235, and rejected by the Court, ECF No. 278. The record shows no attempt by Cortron to renew the point during the directed verdict colloquy two years later. Indeed, Cortron's trial counsel expressly passed up the opportunity to make any argument on the legal sufficiency of the trade secrets claims. Trial Tr. 2175 ("I'm not going to argue on trade secrets.").

To be sure, the Court had already said that it did not intend to direct a verdict on the trade secrets claim, which might account for counsel's comment. *See id.* at 2174-75. But the Court did not prevent counsel from making a brief argument that would have put the Court and MacDermid on notice of Cortron's objection. Prior to being interrupted by MacDermid's trial counsel asking about the trade secrets claims, the Court had told Cortron's trial counsel, "I'll hear from you," with regard to the claim for spoliation of evidence. *Id.* at 2174. After the Court made clear that it would submit the trade secrets count to the jury in lieu of the spoliation count, it was Cortron's trial counsel, not the Court, who decided to move on to the computer crime count without addressing the trade secrets count. *See id.* at 2174-75.

Cortron's unpreserved challenge to MacDermid's CUTSA claims—that all the evidence points to the information being readily ascertainable by proper means—is precisely the sort of challenge that MacDermid could potentially have overcome with additional evidence if the challenge had been made at the appropriate time. There is therefore no "manifest injustice" in declining to enter judgment as a matter of law in Cortron's favor.

### D.    Computer Crime Count

Cortron also moves for judgment as a matter of law against MacDermid on MacDermid's claim that Cortron committed a computer crime that caused damage to MacDermid. Cortron

contends (1) that "the relevant statute cannot reasonably be read to prohibit a company's deletion of data from its *own* computer" and (2) that a "payment dispute [with Cortron], not Cortron's deletion of data, caused MacDermid's alleged injury." Cortron Mot., at 29-30.

Neither of those arguments is preserved, as the issues were not raised during the colloquy on Cortron's motion for a directed verdict. *See* Trial Tr. 2171-77. Cortron's trial counsel argued that there was insufficient evidence because the testimony by one of Cortron's witnesses suggested that only a "shadow file" was deleted, *id.* at 2175—testimony that was impeached by MacDermid and that the jury was free to disregard. The Court gave counsel an opportunity to raise additional arguments, *id.* at 2176 ("What else?"), and he instead moved on to discussing MacDermid's request for a declaratory judgment. Cortron did previously move on November 4, 2009, to dismiss the computer crimes count based on its view that the statute could not be read to apply to deletions from one's own computer. ECF No. 100. But the Court denied that motion on September 15, 2010. ECF No. 170. At trial, before the count was submitted to the jury, Cortron gave neither the Court nor MacDermid any reason to believe that it intended to pursue these arguments further, despite having opportunities to do so.

There is no "manifest injustice" in declining to enter judgment as a matter of law in Cortron's favor. True, unlike other alleged deficiencies in MacDermid's case, an interpretation of Connecticut's computer crimes statute that made it inapplicable to Cortron's conduct would not have been curable by additional evidence. But this Court already held in its September 15, 2010 ruling that the statute could apply to Cortron's conduct, and Cortron has not presented cogent and compelling reasons to depart from that prior ruling. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that when a court has ruled on an

issue, that decision should generally be adhered to by that court in subsequent stages in the same

case unless cogent and compelling reasons militate otherwise.") (quotation marks omitted).

### E.    Unfair Trade Practices (CUTPA) Count

Finally, Cortron asserts that MacDermid's CUTPA claims fail as a matter of law because

(1) they are "derivative of" other causes of action that themselves fail as a matter of law and (2) a

"simple contract breach is not sufficient to establish a violation of CUTPA." Cortron Mot., at 31.

These arguments appeared in Cortron's September 9, 2011 motion for summary judgment, ECF

No. 235, but were rejected by the Court in its August 30, 2012 ruling, ECF No. 278. Cortron

gave no indication during the July 3, 2014 directed verdict colloquy that it would continue to

challenge the legal sufficiency of the CUTPA claims at all, let alone on those specific grounds.

*See* Trial Tr. 2171-77. The arguments are therefore unpreserved.

Further, in light of CUTPA's broad definition of "unfairness," *see Naples v. Keystone*

*Bldg. & Dev. Corp.*, 990 A.2d 326, 336-37 (Conn. 2010), there was sufficient evidence of

conduct above and beyond a "simple contract breach" that the jury could reasonably have

considered unfair, regardless of whether such conduct also would be sufficient to sustain the

other counts. And even if that were not the case, there would be no "manifest injustice" in

declining to grant judgment as a matter of law on this count.

### IV.    Whether Cortron Is Entitled to a New Trial as to Liability

"A district court may grant a motion for new trial under Rule 59 if the jury has reached a

seriously erroneous result or [its] verdict is a miscarriage of justice." *Stampf v. Long Island R.*

*Co.*, 761 F.3d 192, 202 (2d Cir. 2014) (quotation marks omitted). "It is well settled that a trial

judge's disagreement with the jury's verdict is not sufficient reason to grant a new trial." *Mallis*

*v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983).

This was a long trial with a voluminous set of exhibits, testimony by over a dozen fact and expert witnesses, and claims and counterclaims of corporate malfeasance and dishonesty on both sides. The case required the jury to make a myriad of credibility determinations and judgments about the weight of the evidence. The jurors gave every indication of having paid careful attention to the evidence during the trial. Taking account of all the evidence presented during the trial, the Court does not find that the jury's verdict represents a seriously erroneous result or a miscarriage of justice. The motion for a new trial on the issue of liability is therefore denied as to all counts.

### V.   Whether the Compensatory Damages Should Be Remitted

As set forth below, the Court grants in part Cortron's request for remittitur. After considering the amounts awarded by the jury, how those amounts relate to one another and the underlying injuries compensable under each cause of action, and the record of the trial and pretrial proceedings, the Court finds that some amounts awarded to MacDermid were duplicative and therefore excessive. The Court reaches that conclusion based on evidence that the jury's verdict can only reasonably be interpreted as compensating certain injuries more than once, which is impermissible and may have resulted from information conveyed to the jurors during closing arguments. The Court will therefore order a new trial on the issue of damages unless MacDermid agrees to remit the compensatory damages, which were awarded at $35,423,997 on the verdict form, down to $19,757,854.

### A.   Legal Standard for Excessive Compensatory Damages

Whether the jury's award was excessive is governed by federal law for the federal antitrust claims and by Connecticut law for the remaining claims.[6] Under federal law, a verdict is

---

[6] *See Imbrogno v. Chamberlin*, 89 F.3d 87, 90 (2d Cir. 1996) ("In deciding remittitur motions in diversity cases, federal courts apply federal procedural standards and state substantive law."); *Baker v. Coughlin*, 77 F.3d 12, 15 (2d

excessive if "the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken" or if "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quotation marks omitted). Under Connecticut law, "the relevant inquiry is whether the verdict falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion that it was due to partiality, prejudice or mistake." *Duncan v. Mill Mgmt. Co. of Greenwich*, 60 A.3d 222, 244 (Conn. 2013) (same). "[R]emittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." *Id.* (same). Damage awards "must be supported by more than speculation . . . but need not be established with exactness [as] long as the evidence affords a basis for a reasonable estimate by the jury." *Id.* at 245 (same).

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995). If a district court opts for the remittitur procedure, it "should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990).

### B.    The Remedy for Duplicative Compensatory Damages

In its post-verdict motion, Cortron argues that the Court should address the issue of duplicative damages—that is, damages that compensate a party more than once for the same injury—separately from the issue of excessiveness because "when a jury award is duplicative, a

---

Cir. 1996) ("In applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim.").

court need not use the remittitur procedure, and can enter a judgment reflecting a non-duplicative award without granting the option of a new trial." Cortron Mot., at 4. In support of that proposition, Cortron cites *Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir. 1994), in which the Second Circuit affirmed the district court's entry of judgment in an amount equal to half of the jury verdict, which the district court had concluded was duplicative.

The implicit holding of *Conway* is in tension with a more explicit statement by the Second Circuit as to the appropriate remedy for a duplicative award. *Bender v. City of New York*, 78 F.3d 787, 794 (2d Cir. 1996) ("[T]he aggregate award is excessive, primarily because of the considerable extent to which it represents a duplication of damages . . . . To remedy that excessiveness . . . we will reverse the judgment and order a new trial unless Bender agrees to remit . . . ."). Reducing the jury's award without offering a new trial would also raise considerable Seventh Amendment concerns. *See Hetzel v. Prince William Cnty., Va.*, 523 U.S. 208, 211 (1998) ("The Court of Appeals' writ of mandamus, requiring the District Court to enter judgment for a lesser amount than that determined by the jury without allowing petitioner the option of a new trial, cannot be squared with the Seventh Amendment.").

This Court therefore declines to employ such a procedure for addressing potentially duplicative awards, and will instead consider the potential duplication in the jury's award in determining whether the award is excessive, thereby warranting a new trial or a remittitur procedure.

### C.      Duplication on the Antitrust Counts

As to the jury's award of damages under the three antitrust counts—$3.94 million each for Sections 35-26 and 35-28 of the Connecticut General Statutes and $3.94 million under the Sherman Act, for a total of $11.82 million—Cortron argues that "the jury clearly intended to

award total antitrust damages of [$3.94 million]" and therefore mistakenly tripled the award. Cortron Mot., at 35. It then argues that even a single award of $3.94 million would be impermissible as "speculative" and having "no basis in evidence." *Id.* at 35.

Assuming for the sake of argument that the jury made a mistake as to the antitrust verdict, rendering the amount of damages duplicative and therefore excessive, Cortron would not be entitled to relief because any such mistake was invited by Cortron. *See United States v. Bastian*, 770 F.3d 212, 218 (2d Cir. 2014) ("Denying relief even for plain errors where a defendant deliberately provokes a procedural irregularity, the invited error doctrine seeks to avoid rewarding mistakes stemming from a defendant's own intelligent, deliberate course of conduct . . . .") (quotation marks omitted). Not only did Cortron fail to object to the structure of the antitrust portion of the verdict form, but Cortron's trial counsel actively advocated for that structure, Trial Tr. 2355 ("If we're going to break the three causes of action out, I think there ought to be a damage amount for each cause."), and asked that the Court *not* explain the structure completely to the jurors, *id.* at 2359 (The Court: "No instruction in there at all about not reaching one or the other, just let them go through it." Mr. Raabe: "Yes.").

Further, Cortron has not shown that such a mistake was made. There is a presumption that a jury's award is valid, and "[t]he *possibility* of non-duplicative awards is enough to sustain the jury verdict." *Bseirani v. Mahshie*, 107 F.3d 2, at *2 (2d Cir. 1997) (emphasis added). This Court will not infer, as Cortron urges, that the jury meant to award only a single $3.94 million amount merely because the same amount appears three times. *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir.1995) ("A jury's award is not duplicative simply because it allocates damages under two distinct causes of action. The Bank made no showing other than the allocation of the award. Thus, it failed to establish the jury awards were duplicative.") (citations

21

omitted); *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153-54 (2d Cir. 1991) ("[T]he fact that the jury divided their award . . . into two equal parts" and "allocated the damages under two different causes of action" does not, on its own, "demonstrate that a jury's award is duplicative.").

Cortron points to a comment made to the jurors during closing arguments by MacDermid's trial counsel, arguing that it might have led them to write the same award three times without intending to award the aggregate amount. *See* Trial Tr. 2394 ("We put the same amount in for each one of them, but they're three different theories of getting to that. We're not asking for it over and over again."). But the "amount" that MacDermid's trial counsel asked the jury for was $10.65 million, not $3.94 million. *Id.* at 2390 ("I'm going to now summarize what we're look [sic] for in the case. But for the antitrust damages it's $10,652,231."). The $3.94 million number was never mentioned.

Moreover, the Court instructed the jury not to duplicate its awards:

> Even if you find that a party has proven that it suffered damages, you may not award it more in compensatory damages than would reasonably compensate it for the injury or loss that it has suffered. A party may not recover more than once for the same loss, even if it prevails on two or more causes of action. Therefore, if you find that any compensatory damages should be awarded to either party, you should review your verdict form, which you will receive tomorrow, to be sure that the total amount of any compensatory award does not compensate any party more than once for a particular loss.

*Id.* at 2344; *see also United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions."); *Lieberman v. Dudley*, 199 F.3d 1322, at *2 (2d Cir. 1999) ("In its jury instruction the district court gave exactly the kind of detailed warning about duplicative damage awards that we asked for in *Bender*. We therefore have no basis upon which to set aside the awards returned by the jury.").

22

Nor does the Court find anything troubling about the disparity between the total $11.82 million award and the $10.65 million award that MacDermid had requested, which Cortron presents as further evidence that the jury "clearly" could not have intended a total antitrust award of $11.82 million. Cortron Mot., at 35. The jury would have been within its rights to depart reasonably from Dr. Levinsohn's estimate of $8.8-10.6 million, Trial Tr. 688-89, and the jury's question to the Court during deliberations about whether it could reasonably depart from the damages estimate provided by MacDermid's expert greatly undercuts Cortron's argument, Trial Tr. 2467.

Cortron then argues that the $3.94 million number, despite being what the jury "clearly intended," had "no basis in evidence." Cortron Mot., at 35. Cortron is correct that the $3.94 million number was far off from MacDermid's requested damages of $10.65 million—which, as noted, undercuts Cortron's argument about duplication—but the wide gap between those numbers is significant only if one accepts Cortron's duplication claim as a premise. A perfectly reasonable alternative explanation is that the jury departed *upward* from the expert's estimate by approximately one million dollars (or about ten percent) and then divided the award equally among the three causes of action. This explanation is certainly a "possibility," *Bseirani v. Mahshie*, 107 F.3d 2, at *2, and would entail neither a duplication problem nor an evidentiary-basis problem.

Finally, the Court notes that the jury seems to have arrived at a number for CUTPA damages, discussed in greater detail below, by adding together the amounts sought under the other causes of action, as MacDermid's trial counsel requested in his closing argument. The jury included in that sum the $3.94 million figure, rather than the larger $11.82 million figure, which argues in favor of an inference that the jury viewed $3.94 million, not $11.82 million, as its

antitrust award. But the Court must sustain any verdict that is *possibly* non-duplicative. And there was nothing forcing the jury, in adding an antitrust component to the CUTPA award, to choose between all or nothing. The jury may well have decided that adding together the full amount of damages under the other causes of actions would be too large an award under CUTPA and so opted to add only a fraction of the antitrust component to the total. Moreover, as already discussed, there are countervailing reasons to doubt that the $3.94 million figure was what the jury intended as its total antitrust award.

The Court therefore does not find that the antitrust awards were duplicative. Nor do the awards shock the conscience or exceed the limits of fair and reasonable compensation. There is no basis to disturb the jury's findings as to the antitrust damages.

### D. Duplication on the Non-Antitrust Counts

#### i. The Jury's Awards Are Duplicative

The record supports Cortron's theory of duplication on the non-antitrust counts. In his closing argument, MacDermid's trial counsel made detailed recommendations to the jury that, more so than his recommendations as to the antitrust claims, would be likely to lead a jury to award the same amount twice without intending to award the doubled amount, notwithstanding the Court's instruction to take care not to compensate the same injury twice.

MacDermid's trial counsel told the jurors that MacDermid's contract claim had several "parts" and then described those parts as the two trade secrets claims, totaling $7.70 million, and the smaller "straight contract claims" that totaled $204,197. Trial Tr. 2390-91. Although he then told the jury that the trade secrets components of the contract claim were "duplicated on the state statutes" and that he was "not asking for the same thing twice" but rather offering "different

theories,"[7] he also told jurors that "the judge is going to make sure we're not double dipping." *Id.* at 2391. Similarly, on MacDermid's CUTPA claim, he told jurors, "What we did is we simply added up what the damages were from the antitrust, federal antitrust, state antitrust, the breach of contract, the damages regarding the protection of proprietary information, and we added them all up and came up with $18,566,140. And that is what we're asking you to award on violation of CUPTA. We're not asking for duplications." *Id.* at 2393.

Based on the amounts that the jury awarded—with the awards being precisely equal to the sums of various "parts" or "components" listed by MacDermid's trial counsel—there is compelling evidence that the jury adopted MacDermid's suggested additive computations, and did so under the assumption that the Court would sort out the duplication. As Cortron points out, the contract award of $7.90 million "equals the sum of the trade-secret disclosure, trade-secret destruction, hot roll and ventilation, and miscellaneous work components MacDermid outlined for the jury," Cortron Mot., at 33, and the CUTPA award of $11.88 million equals the sum of the remaining claims, counting only one antitrust claim of $3.94 million, *id.* at 32. These calculations are illustrated below in Figure 1.

---

[7] Dr. Levinsohn's testimony supported this request. Trial Tr. 743-44 ("[T]he agreement between DuPont and Cortron, violated the term of a contract. . . . So the damages associated with that are exactly the same as the damages that went along with the first claim. It's also my understanding that the misappropriation of trade secrets, same act, violated a contract. So damages for the same act are the same."); 833-34 (Q. "And with regard to the antitrust damages and the contract damages, in your direct you kind of summarized your contract damages and said they're essentially the same as the antitrust number and the trade secret number?" A. "That's correct.").

**Figure 1**

|  | CUTPA Award | Components | Breach of Contract Award |
|---|---|---|---|
|  | $3,790,939 | Amount requested for disclosure of trade secrets damages and **_already awarded under CUTSA count._** | $3,790,939 |
| + | $3,908,773 | Amount requested for destruction of trade secrets damages. | $3,908,773 |
| + | $204,197 | Amount requested for miscellaneous breach of contract damages. | $204,197 |
| + | $29,970 | Amount requested for computer crimes damages and **_already awarded under computer crimes count._** |  |
| + | $3,941,325 | Amount equal to one-third of what jury **_already awarded under antitrust counts_**, the total award being close to what was requested. |  |
| = | $11,875,204 |  | $7,903,909 |

The inference of unintentional duplication is especially warranted here, given that the alternative explanation—that in awarding the same "components" requested by MacDermid under two or three causes of action, the jury intended to award double or triple what was requested—is implausible and would create awards far above what Dr. Levinsohn's testimony provided evidentiary support for. This was not so with the antitrust damages, as to which it is reasonable to attribute to the jury the intention to award the aggregate amount of $11.82 million, which was only a slight departure from the $10.65 million estimate requested by MacDermid. But it would be unreasonable to interpret the non-antitrust awards in the same way.

The Court rejects MacDermid's argument that Cortron has waived its claim as to duplication in the CUTPA and breach of contract awards by failing to object to the verdict form and/or poll the jury on these issues. There was no reason for Cortron to believe that an objection to the contract and CUTPA portions of the verdict form was necessary or appropriate; the duplication on those counts stemmed not from the verdict form's structure, but rather from the jury's computation of the amount of damages based on Dr. Levinsohn's testimony and the closing arguments. And there was no reason to believe that the Court's jury instruction on duplication did not already address the risk of duplication in computation.

Cortron's decision not to poll the jury (or, more precisely, to ask the jury for clarification) also does not amount to waiver. It is true that the Second Circuit has cited the failure to request polling of the jury, along with the failure to request appropriate jury instructions or to object to the verdict form, as grounds for a finding of waiver of a challenge to duplicative damages. *Bseirani v. Mahshie*, 107 F.3d 2 (2d Cir. 1997) ("Mahshie admits . . . that there is a hypothetical scenario on which the damages are not duplicative. That being the case, he had either to seek clarification from the jury or be held to have waived the argument that the damages are

duplicative."); *see also Metron Tech. Distribution Corp. v. Discreet Indus. Corp.*, 189 F. App'x
3, 4 (2d Cir. 2006).

But this case does not involve the kind of evident jury mistake that a court usually
addresses before the jury is discharged, such as an inconsistency between a general verdict and
special interrogatories. *See* Fed. R. Civ. P. 49. The duplication here is not apparent from the
verdict form itself and only becomes visible when one considers the evidence and MacDermid's
closing argument, and then separates out the amounts at issue. In light of this, the Court finds
that requiring Cortron to have requested jury polling here would be to demand that Cortron have
insisted on a complicated and time-consuming endeavor. First, the parties and the Court would
have had to study the verdict form with a calculator and with a clear memory of MacDermid's
requests in closing argument (or with its demonstrative damages exhibit on hand). Even then the
specific nature of the duplication would not have been immediately apparent, because of the
jury's apparent decision to include some but not all of the antitrust damages in the CUTPA
damages. No doubt that counsel and the Court could have sorted this out eventually, but they
could not have done so at a quick sidebar while holding the jury for a few moments. It is likely,
instead, that the Court would have had to excuse the jury for at least a day while it and counsel
considered the verdict and the precise nature of the duplication involved, and then summoned
them back to ask specific and carefully vetted questions about which parts duplicated other parts.
The answers, too, would likely have been complicated, as shown in the duplication analysis
above. Under these circumstances, the Court finds that requesting clarification from the jury to
determine which parts of the verdict were duplicative would not have been an efficient or
productive procedural step towards an easy "fix"—which is the rationale for requiring objections

28

about inconsistency and, in some cases, evident duplication to be made while the jury is still empaneled.

### ii.        Amounts to Be Reduced

Having found duplication, this Court must still make every effort to provide a rational explanation for each component of the jury's verdict and must remit damages only by the smallest amount necessary to eliminate the duplication. *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) ("Crucial to the practice of remittitur . . . is the requirement that the court confine its role to the removal of the excess portion of the verdict so that the damage calculation leaves in the judgment a portion of what the jury awarded.") (quotation marks omitted).

The Court begins by remitting duplicative amounts from the CUTPA award. Remitting the duplicative amounts from the CUTPA award, rather than the other causes of action under which they appear, follows from the fact that CUTPA claims, when pled together with an overlapping cause of action based on the same conduct, are generally treated as "derivative of" the overlapping cause of action. *See, e.g.*, *Francis v. Lantz*, No. CV094034844, 2009 WL 2783721, at *7 (Conn. Super. Ct. July 31, 2009); *Snyder v. Chestnut Grove, LLC*, No. FSTCV075004785S, 2009 WL 5698123, at *3 (Conn. Super. Ct. Dec. 23, 2009). That treatment suits this case because MacDermid told the jury, in essence, that the CUTPA claim incorporated all the other claims. Trial Tr. 2392 ("Then the last statute is CUTPA . . . . [T]his is the statute that summarizes everything that is wrong with what happened in this case . . . . [I]t's kind of a catch-all statute."). And because CUTPA "imposes no specific limit on the ratio of punitive damages to compensatory damages," *Ulbrich v. Groth*, 78 A.3d 76, 121 (Conn. 2013), remitting duplicative amounts from the jury's CUTPA award will not undermine MacDermid's ability to recover

punitive damages based on the jury's finding of conduct that was recklessly indifferent or willful and malicious.

The CUTPA damages of $11,875,204 included amounts equal to the damages on the breach of contract count ($7,903,909) and computer crimes count ($29,970), as well as a remainder equal to one-third of the antitrust damages ($3,941,325). As all of the injuries underlying these amounts are compensated elsewhere in the verdict, the entirety of the CUTPA award is duplicative and should be remitted.

Next, the breach of contract damages of $7,903,909 included amounts equal to the damages on the disclosure of trade secrets claim ($3,790,939), the amount that MacDermid requested for the destruction of trade secrets but was not awarded as trade secrets damages ($3,908,773), and an amount equal to what MacDermid claimed it was owed for miscellaneous damages resulting from the breach of contract ($204,197). Only the $3,790,939 for the disclosure of trade secrets is duplicative, and the Court proposes to remit that amount from the breach of contract count, rather than the trade secrets count. In prevailing on its trade secrets count, MacDermid effectively made a greater showing than required to establish breach of contract. And remitting the amount from the trade secrets count could arguably prejudice MacDermid's ability to recover punitive damages based on the jury's finding of willful and malicious conduct. *See* Conn. Gen. Stat. § 35-53 (limiting punitive damages to twice the award for actual loss and/or unjust enrichment).

For those reasons, the Court finds that the jury's awards of $7,903,909 for breach of contract and $11,875,204 for violations of CUTPA were excessive, in that portions of those amounts were awarded in error as a result of mistaken duplication. The Court will therefore vacate these awards and order a new trial on damages unless MacDermid consents to accept

compensatory damages of $4,112,970 for breach of contract and $0 for CUTPA violations. That would remit the total compensatory damages, which were awarded at $35,423,997 on the verdict form, down to $19,757,854.

### E.    Evidentiary Basis for Trade Secrets Damages

Cortron argues that the damages compensating MacDermid for the disclosure and destruction of its trade secrets (which, as already discussed with regard to duplication, are "components" of the jury verdict on more than one count) are excessive and lacking evidentiary support. The Court rejects this argument.

Beginning with damages for disclosure of the trade secrets ($3,790,939), the Court finds that the amount falls within the limits of fair and reasonable compensation and is based on the evidence. The jury adopted Dr. Levinsohn's estimate for what the stolen drawings and technical information about LAVA technology would have been worth in a "hypothetical negotiation" between MacDermid and DuPont. Cortron disputes that DuPont would ever have paid $3.79 million for the drawings and technical information, given that OLEC Corporation, which built MacDermid's LAVA processors after Cortron ceased doing business with MacDermid, was able to re-engineer the information at a cost of $29,970 and that DuPont already had "superior" technology anyway. Cortron Mot., at 36-37. The jury's decision to credit the hypothetical negotiation figure of $3.79 million offered by Dr. Levinsohn, notwithstanding the much lower $29,970 figure paid to OLEC by MacDermid, could easily have been due to a determination that the $29,970 had little relevance to determining the market value of the information. In re-engineering the information for $29,970, OLEC had access to earlier drawings and other assistance provided by MacDermid. A competitor like DuPont ordinarily would not; the choice would be between paying for the information or reverse engineering it from scratch.

31

The damages for destruction of the trade secrets ($3,908,773) also fall within the limits of fair and reasonable compensation and are based on evidence. The fact that MacDermid was able to recreate the technical information within approximately nine months at a cost of $29,970 may suggest that $3.91 million is a high estimate for actual economic losses. But CUTSA authorizes restitutionary damages to disgorge unjust enrichment, if the amount of unjust enrichment exceeds the plaintiff's actual losses. Conn. Gen. Stat. § 35-53(a).[8] The jury seems to have adopted a restitutionary measure of damages, in that it awarded Dr. Levinsohn's estimate for what Cortron would have paid if, instead of destroying the data, Cortron had bought from MacDermid the right to withhold the data from MacDermid. By destroying the data, Cortron wrongfully received the benefit of temporarily preventing MacDermid from producing new LAVA machines, effectively giving DuPont, MacDermid's competitor and Cortron's new business partner, a strategic advantage. Estimating what Cortron would have paid *rightfully* to receive that benefit was a method of measuring Cortron's unjust enrichment supported by Dr. Levinsohn's testimony.

Finally, the fact that Cortron offered to sell the destroyed data back to MacDermid for $102,000, which Cortron argues was an opportunity to mitigate damages, is not relevant to the question of restitution. And in any event, the jury was entitled to find it unreasonable to expect MacDermid to mitigate by paying a ransom for its own data to an entity the jury found to have stolen it. *See* Trial Tr. 2343 (jury charge) ("If either party *unreasonably* failed to take advantage

---

[8] Restitutionary damages are available here even though the jury awarded the $3.91 million for destruction of trade secrets under the CUTPA count rather than the CUTSA count. CUTPA authorizes restitutionary measures of damages equal to the defendant's unjust enrichment. *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 n.3 (2d Cir. 1985) ("Damages under CUTPA are to be measured according to a restitution formula rather than according to contract principles."); *F.T.C. v. Verity Int'l, Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006) ("The appropriate measure for restitution is the benefit unjustly received by the defendants.").

of an opportunity to lessen its damages, you should deny recovery for those damages that it would have avoided had it taken advantage of the opportunity.") (emphasis added).

## VI.   MacDermid's Motion for Punitive Damages

MacDermid moves for an award of punitive damages on its antitrust, CUTSA, and CUTPA claims. As set forth herein, the Court awards treble damages on the antitrust counts, adding $23,647,950 to those counts, double damages on the CUTSA count (for disclosure of trade secrets), adding $3,790,939 to that count, and $100,000 in punitive damages on the CUTPA count (for destruction of trade secrets).

### A.   Antitrust Counts

Both state and federal antitrust statutes require that treble damages be awarded to successful plaintiffs. 15 U.S.C. § 15 ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained . . . ."); *Westport Taxi Serv., Inc. v. Westport Transit Dist.*, 664 A.2d 719, 742 (Conn. 1995) ("Like the federal statutes, § 35–35 mandates an award of treble damages . . . ."). Although Cortron maintains that the state antitrust counts are duplicative of the federal count, *see supra* Subsection V.C, it concedes that MacDermid is entitled to treble damages on antitrust claims, Unredacted Opp. Pun. Dam., Atty.'s Fees, Interest, & Decl. Injunct. Relief ("Cortron Opp."), at 25. The Court therefore triples the jury's antitrust award of $11,823,975, arriving at a total award of $35,471,925.

### B.   CUTSA and CUTPA Counts

Punitive damages under CUTSA may be awarded "if the court finds wilful and malicious misappropriation." Conn. Gen. Stat. § 35-53. Under CUTPA, "[i]n order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Ulbrich v. Groth*, 78 A.3d 76, 121 (Conn.

33

2013). On its verdict form, the jury found that these standards had been met, and the Court agrees for the reasons below.

As a preliminary matter, given the derivative nature of the CUTPA claim in this case, the Court will not impose further punitive damages under CUTPA where punitive damages for the underlying conduct are already provided for under a different count—even though the jury's finding of reckless indifference or willful and malicious conduct under CUTPA could apply to all of Cortron's conduct. It is, however, appropriate to award punitive damages under CUTPA arising from Cortron's destruction of trade secrets. The jury did not include a compensatory award for the destruction of trade secrets under the CUTSA count but did include the requested damages within the CUTPA award. The jury thereby found that Cortron's destruction of MacDermid's technical information was an unfair trade practice—and an intentional or recklessly indifferent one at that—even though the conduct did not meet the standard for misappropriation of trade secrets under CUTSA.

In determining the appropriate size of the punitive damages under both CUTSA and CUTPA, the Court is guided by factors outlined by the Connecticut Supreme Court for determining whether punitive damages are excessive:

> [T]he degrees of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional or malicious . . . whether the defendant's action was taken or omitted in order to augment profit . . . whether the wrongdoing was hard to detect . . . whether the injury and compensatory damages were small, providing a low incentive to bring the action . . . and whether the award will deter the defendant and others from similar conduct, without financially destroying the defendant. . . . Of these factors, the reprehensibility of a defendant's conduct is the most important. . . . Reprehensibility is determined by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Ulbrich*, 78 A.3d at 126-27 (citations and quotation marks omitted).[9]

      Cortron's degree of blameworthiness is high. It is hard to imagine a clearer case of willful and malicious misuse of another company's trade secrets. The record establishes, and the jury's verdict reflects, that management at Cortron deliberately delivered copies of MacDermid's customer list and technical drawings to DuPont, MacDermid's rival, and then destroyed the electronic versions of the drawings, knowing full well that Cortron had a duty to keep that information confidential, and intending to harm MacDermid's business and promote Cortron's and DuPont's business. Testimony showed that Cortron officials knew that it was wrong to disclose the secrets to DuPont but did so anyway. Further, these actions unfolded as part of a larger scheme, carried out in concert with DuPont. In one sense, Cortron's wrongdoing was not "repeated," as it all arose from the same set of business deals, but it was hardly an "isolated incident."

      The Court is mindful that the injuries here are economic, not physical, and that MacDermid was not an especially vulnerable target. But CUTSA authorizes punitive damages as large as twice the jury award despite the fact that CUTSA claims will rarely, if ever, involve physical harms, and targets will generally be business entities. Therefore, in the context of trade secrets misappropriation, the absence of those factors does not weigh heavily against a large punitive damages award.

      The final consideration is the role of punitive damages in deterring wrongdoing and encouraging victims to seek remedy. Cortron's actions exemplify hidden corporate warfare that easily escapes detection. Without the potential for large economic consequences, businesses will

---

[9] The court analyzed these factors in the context of a CUTPA claim, but nothing about the court's reasoning suggests that the factors are any less applicable to a CUTSA claim.

have little incentive to eschew cutthroat tactics like Cortron's, and victims like MacDermid will have little incentive to seek relief from the justice system.

On the other hand, the jury has already sent a powerful message with combined damages of $7,699,712 for Cortron's trade secrets misconduct. The verdict represents a rebuke of Cortron, in that the jury rejected Cortron's proffered justifications for its actions and fully adopted Dr. Levinsohn's perhaps generous damages estimates. This is particularly true of the destruction component, for which it seems that the jury awarded a restitutionary measure of damages rather than a compensatory measure, the latter likely being much smaller. The jury was within its rights to do that, but in doing so, has already forced Cortron to disgorge any potential profit from the wrongful destruction.

The Court therefore doubles the jury's CUTSA award, adding $3,790,939 in punitive damages as punishment for Cortron's willful and malicious disclosure of MacDermid's trade secrets. For Cortron's intentional or recklessly indifferent violation of CUTPA in destroying MacDermid's trade secrets, the Court awards $100,000 in punitive damages.

## VII.   MacDermid's Motion for Fees and Offer-of-Compromise Interest

The Court will rule separately on the issue of attorney's fees and offer-of-compromise interest, once the parties have filed the supporting documentation required by the Court's January 14, 2015 order, ECF No. 466.

## VIII.   MacDermid's Request for Declaratory and Injunctive Relief

MacDermid seeks a declaratory judgment "constru[ing] and apply[ing] the terms of the contracts controlling the rights and obligations of MacDermid and Cortron"—that is, the Joint Development Agreement and Manufacturing Agreement—as well as an injunction permanently "enjoining Cortron from acting in a manner that is inconsistent with the declaratory relief."

Unredacted Mem. L. Sup. Pun. Dam., Atty.'s Fees, Interest, & Injunct. Relief, at 32-39. The Court denies both requests.

The Declaratory Judgment Act provides that "in a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. This language is a "broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). In "decid[ing] whether to entertain an action for declaratory judgment" a district court should ask "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).

The jury has already found that Cortron breached its contractual obligations to MacDermid, and that MacDermid did not breach its obligations. This effectively resolved the parties' "actual controversy" about their contractual obligations. A request for declaratory judgment should be denied where it "is based on the same alleged facts and circumstances underlying [a] claim for breach of contract and seeks no relief that is not implicitly sought in the breach of contract cause of action." *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, No. 13 CIV. 1725 LGS, 2014 WL 4054240, at *6 (S.D.N.Y. Aug. 15, 2014). The fact that particular contractual provisions have "not necessarily be[en] adjudicated in connection with the breach of contract cause of action" and may "again become relevant" in a future dispute does not create the kind of "definite and concrete" dispute that is required for a declaratory judgment. *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127

(2007)). Further, the Court doubts that any such concrete dispute will emerge, given the evidence that Cortron ceased operating years ago and the absence of any evidence that it has reopened its operations. The Court therefore declines to grant declaratory relief.

MacDermid's request for a permanent injunction is also denied. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *U.S.S.E.C. v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 296 (2d Cir. 2014). MacDermid has made no showing that the award of money damages is inadequate compensation for its injuries, or that there is a need to enjoin Cortron from future violations of the law several years after its closure.

**Conclusion**

For the foregoing reasons, the Court DENIES Cortron's motion for judgment as a matter of law (ECF No. 436)  and motion for directed verdict (ECF No. 402), and DENIES Cortron's motion for a new trial (ECF No. 436) provided that MacDermid agree to a remitted award of $19,757,854 in compensatory damages. MacDermid shall file on the docket within 14 days of this ruling a statement either accepting a modified compensatory award in the amount of $19,757,854 or opting for a new trial. MacDermid's motion for punitive damages, attorney's fees, offer-of-compromise interest, and declaratory and injunctive relief (ECF No. 437) is GRANTED IN PART AND DENIED IN PART, and the Court awards $27,538,889 in punitive damages. The Court reserves decision on the matter of attorney's fees and offer-of-compromise interest.


**SO ORDERED** this 20th day of January, 2015, at Hartford, Connecticut.


　　　　　　　　　　/s/
　　　　　　　　　　Michael P. Shea
　　　　　　　　　　United States District Judge